HANSON *et al.* v. VERNON *et al.*

I. Per CURIAM.

1. **Constitutional law**: TAXATION: FOR CONSTRUCTION OF RAILROADS: The legislature have no constitutional power to authorize the taxation of the people or property of a township, town or city, in order to raise a fund to be given as a gratuity to a railroad company to aid it in the construction of its road through that vicinity.

2. —— EXTENT OF LEGISLATIVE POWER. The legislature cannot lawfully interfere with private property except in the following cases:

  1. It may authorize it to be forfeited for crime, or sold for the owner's debts judicially established, or in pursuance of judicial proceedings.

2. It may take it for *public* use under the power of eminent domain, on condition of just compensation being made *in money*. For any *private* use the legislature cannot touch the property of the citizen, even if it does make compensation.

3. It may, under peculiar circumstances, condemn it under the *police power*, when the property, or its use, or situation, is such as to endanger the public health, welfare, or safety.

4. It may be taken by virtue of the taxing power.

3. ―― ACT OF 1868: NATURE OF LEGISLATIVE POWER TO TAX. Chapter 48, Acts of 1868, entitled "An act to enable townships and incorporated towns and cities to aid in the construction of railroads," is not a valid or legitimate exercise of the taxing power, and though the money demanded of the citizen is called a tax, properly speaking it is not such, but, in fact, a coercive contribution in favor of private railway corporations, and violative, not only of the general spirit of the constitution as to the sacredness of private property, but of that specific provision which declares that no man shall be deprived of his property without due process of law.

4. ―― THE TAXING POWER. The taxing power of the State invested in the legislature is the authority to levy and collect taxes, and assessments in the nature of taxes.

5. ―― WHAT TAXES ARE. Taxes are burdens or charges imposed by the legislature upon persons or property to raise money for public purposes, or to accomplish some governmental end. A public governmental use or purpose is essential to a valid tax.

6. ―― It is the circumstance that *taxes* are contributions demanded for the *use of the government*, and not for *private* uses, that confers upon the power to tax its peculiar character ; and were it not for this consideration, the severe and stringent laws authorizing, without judicial proceedings or personal notice, the sale of property for delinquent taxes, would be condemned as despotic, and infringements of constitutional rights.

7. ―― LIMITATIONS ON THE TAXING POWER. While there is no limit upon the taxing power when exercised for a proper governmental purpose, yet the question as to what is such a purpose is subject to revision by the courts.

8. ―― DIFFERENT KINDS OF UNCONSTITUTIONAL LAWS. It is a well settled principle of American constitutional law, that an act of the legislature may be unconstitutional in two ways : first, because it assumes, or seeks, to confer power not legislative in its nature ;

second, because it violates some specific provision of the national or State Constitution. The act of 1868, providing for the taxation of property by townships, towns and cities, to aid in the construction of railroads, is unconstitutional in both these respects.

9. —— LEGISLATIVE POWER. The legislature has only the power to raise revenue by taxation for a public purpose ; and when it is raised for a purpose not connected with the public interest, it is no longer taxation, though so denominated, and the attempt is as clearly unconstitutional as any act could be which is expressly prohibited by the Constitution. The prior adjudications of this court, holding that the legislature did not possess the power to clothe counties and cities with authority to aid in the construction of rail roads by subscription for stock therein, and bearing upon the present question, collated and examined by WRIGHT, J.

10. —— JUDICIAL POWER. While the authority to determine what is or is not a public purpose, is in the legislative department, yet this power is not without limit, and the courts, when appealed to, may rightfully determine whether, in the particular case, the burden imposed is for a public or private purpose.

11. —— RAILROAD COMPANIES. Railroad companies are private corporations, and their undertakings can no more be aided by taxation than can the undertakings of any other private corporation, or of an individual.

## II. Per COLE, J., dissenting.

12. —— This court has no power or right to declare an act of the legislature unconstitutional unless it be in conflict with some provision of the written Constitution. The State legislature may exercise all rightful legislative power not denied to it, either expressly or by necessary implication, by the State Constitution.

13. —— That this court has ever *decided* that the legislature did not possess the constitutional power to clothe counties or cities with authority to subscribe stock to aid in the construction of railroads denied.

14. —— There is no clause of our State Constitution which denies to the legislature, either expressly or by necessary implication, the authority to confer upon counties, cities or towns, the power to subscribe stock in, or aid by taxation, the construction of railroads. The decisions of other States wherein the power has been held to exist under similar constitutions, collected.

Hanson v. Vernon.

15. —— Sections 9 and 18 of the bill of rights have no reference to, or limitation upon, the taxing power ; nor has the term "due process of law."

16. —— The legislature is the sole and final judge as to whether the tax in a particular case is for a public or private purpose.

17. —— If this is not so, at least it should be palpable that there is a total absence of all possible public interest in the purposes for which the act in question authorizes the tax to be levied.

18. —— Although railroad companies are technically classified as private corporations, they are not so in the common acceptation of the term, and their *uses* are of a *public* character.

*Appeal from Henry District Court.*

SATURDAY, APRIL 10.

CONSTITUTIONAL LAW :—LOCAL TAXATION IN AID OF RAILROADS. PETITION IN EQUITY, by resident property owners and tax payers against the township trustees and clerk to enjoin further proceedings under the act of March 22, 1868 (Laws 1868, ch. 48, p 54), authorizing local aid to railroads. A copy of this act is set out in the margin.*

---

* AN ACT to enable Townships and Incorporated Towns and Cities to aid in the Construction of Railroads.

SECTION 1. *Be it enacted by the General Assembly of the State of Iowa,* That it shall be lawful for any township, incorporated city or town in this State, through which any railway has been, or hereafter may be located, or to which it may be contiguous, to aid in the construction thereof, as hereinafter provided.

SEC. 2. Whenever a petition shall be presented to the council or trustees of any incorporated city or town, or any township, signed by one-third of the resident tax payers of such township, city or town, asking the question of aiding in the construction of any railway, to be submitted to the voters thereof, it shall be the duty of the trustees, or council, or boards of trustees, to immediately give notice of a special election, such notice to be given in the manner of notices of general elections, which notices shall specify the rate of tax to be raised, at which election the question of "taxation," or "no taxation," shall be submitted ; and if a majority of the votes polled be "for taxation," then, in that case, the township trustees and councils, or trustees of cities and towns, shall at once determine the *per centum* of the same, and cause their respective clerks or recorders to prepare and certify to the clerk of the board of supervisors, as soon as practicable, lists of the same, which shall be an equal percentage on the taxable property in such township, city or town, but said rate shall not exceed five per cent upon the assessed value of the property therein.

An *ex parte* injunction was granted, which was afterward dissolved.

The present appeal is by the plaintiff, from the order of the District Court dissolving the injunction.

Other attorneys than those interested in the cause itself had leave to, and did, submit arguments on the constitutional question involved.

*Theron W. Woolson, Withrow & Wright, F. Semple,* and *Leroy G. Palmer,* for the plaintiffs.

*R. P. Lowe, G. B. Corkhill, H. R. Ambler, John Porter, E. W. Eastman,* and *Henry Strong,* for the defendants.

DILLON, Ch. J. — The only question presented by the record necessary to be decided is, whether the statute of

1. TAXATION: for construction of railroads: constitutional law.

March 22d 1868 (Laws of 1868, ch. 48, p. 54), authorizing local aid to railroads, is a constitutional enactment ?

With possibly one exception, no question in the judicial history of the State has arisen which rivals the present in

---

SEC. 3. That so soon as such tax-lists are prepared, the tax herein provided for shall be due and collectable in the same manner as the county tax is collected; and it shall be the duty of the treasurer of the county to proceed by himself or deputy to collect the same, and to pay it into the treasury of such county; and the same shall be paid out by such treasurer upon the order of the president or managing director of the railroad company, whose road such tax is voted to aid; which order shall be accompanied by estimates of the engineer in charge of the work on such road, showing that an equal amount has been expended for the construction of such work within such county; and it is hereby provided that the tax so raised by any township, city or town, shall be only expended to aid in the construction of such road within such township, or the one contiguous thereto, as near as practicable: *provided,* that any tax payer producing to the county treasurer, prior to the collection of the tax, a voucher of the proper officer of the railroad company, showing that his tax has been paid to the satisfaction of the company, shall, on filing the same with the county treasurer, be discharged from the tax.

SEC. 4. All acts or parts of acts conflicting with the provisions of this act are hereby repealed.

Hanson v. Vernon.

importance, whether it be considered with reference to the grave principles of constitutional law it involves, or the vast material interests, present and future, which it affects. It has been argued on either side with consummate ability. The learned counsel engaged in the cause have, it is believed, omitted no consideration essential to an understanding of the question in all its manifold relations.

It has been argued in the light of principle, and as a question resting on authority.

The adjudged cases bearing upon both sides of it have been examined with that boldness and keen and searching ability to which they are ever subjected when they block up the pathway of able counsel.

If the conclusion arrived at is erroneous, the fault, let it be confessed, is wholly ours. If any previous question, in this court, has approached the present in importance, it was the one concerning the validity of county and city subscription to the stock of railway companies, when it was first presented to our predecessors, in 1853, in the case of *Dubuque County* v. *The Dubuque and Pacific Railroad Co.* (4 G. Greene, 1).

That the majority of the court there reached a wrong result remains no longer a matter of doubt. Subsequent decisions have so declared, and these decisions have the approval of the professional mind of the State. A most unfortunate mistake it was: counties and cities throughout the State, acting under the sanction of that decision, incurred debts amounting to several millions of dollars, and, in many cases, exceeding ther ability to pay. Disaster, the child of extravagance and debt, and dishonor, the unbidden companion of bankruptcy, are the bitter but legitimate consequences of that decision, " and the end is not yet." In every other State in which a similar decision was made, similar consequences have ensued. In

*Sharpless' Case*, hereafter to be referred to, the Supreme Court of Pennsylvania affirmed the validity of such subscription, and the practical commentary upon it may be found in the history of the Alleghany county and Pittsburg cases (*Commonwealth* v. *Alleghany County*, 32 Penn. St. 218, 1858; *Commonwealth* v. *Pittsburg*, 34 id. 496), and in the fact that by an amendment of the Constitution, made in 1857, such legislation is expressly prohibited.

We are now, with respect to this question, where, in 1853, our predecessors were with respect to that — *at its threshhold*, called upon to decide it before rights have grown up under the sanction of any previous decision.

This subject is alluded to, not only because it exhibits the pernicious fruits which an unsound principle of law will ever bear, but because, as will hereafter be shown, the same unsound principle underlies the statute now under consideration.

The thought cannot be repressed, how different would be the situation of our State to-day had the decision in the *Dubuque Case* been the other way. We should have been free of the heavy incubus of debt which that decision bequeathed us, and in all probability had every railroad we now have.

We have allowed our experience, however, no further sway than to lead us to examine the principles involved in the act of 1868 with unusual care. It is quite manifest from the legislative history of the measure, and from circumstances disclosed in the argument, that a decision in favor of the law would be highly satisfactory to many portions of the State. Our decision, although intelligent disinterested professional men must have anticipated the result, will no doubt disappoint many persons. I could have wished it otherwise; and I certainly approached the consideration of the question (as doubtless did every member of the court) with a disposition, as was

Hanson v. Vernon.

my duty, to sustain the act (as gladly I would, notwithstanding my decided convictions of the general impolicy of such legislation), if it could be done without making a dangerous breach in those barriers which the Constitution has erected to protect private property from legislative invasion. Again, the question respecting the validity of the act of 1868, was felt to be complicated with the one concerning the constitutional power of the legislature to authorize public corporations to subscribe for the stock of railway companies, and levy a tax to pay the debt thereby incurred. As before stated, our predecessors, in 1853, by a divided court, held that the legislature had the constitutional power to authorize municipal and public corporations to make such subscriptions.

Subsequently, in 1862, the prior holding was overruled, and the court, without division, held that the legislature could, under the Constitution, confer no such power. *The State, etc.,* v. *Wapello Co.,* 13 Iowa, 388.

This view, in all the subsequent changes of judges, has, without dissent, been adhered to; and was re-affirmed in the most solemn manner by the whole court, as recently as the last term, in the case of *McClure* v. *Owen,* 26 id. 243.

If any thing can be said to be settled in this State, it is, that, under the Constitution, there is no legislative power to endow public or municipal corporations with the faculty of subscribing to the stock of a railroad company and to levy a tax on the inhabitants to pay therefor. Everybody so understands it. I have so understood it ever since I have been upon the bench, and have never felt myself at liberty to regard it as an open question. Not one of the counsel concerned in this cause has asked the court to overturn its decisions, and to hold such subscription and tax to be constitutional.

It being settled, then, that they are unconstitutional, it would justly disgrace this tribunal and the State, if

we should hold the present act to be valid, unless it is *in fact* different from the other question, and unless this asserted difference can be sustained and vindicated by reasons which can endure the keen scrutiny to which they would inevitably be subjected, and which would strike and satisfy the common sense of intelligent men as resting on a solid foundation.

The great effort of counsel who have argued for the validity of the act of 1868 has been to show that a distinction in its favor did exist. In my opinion this effort has not been successful, and, if any distinction can be drawn, it is one unfavorable to the act under consideration. For it might, perhaps, be admitted that, in view of the absolute power of the legislature over public corporations, it might enlarge their powers and capacities, although this might consequentially affect the citizen by increasing his taxes, when it would not be true, and could not be admitted, that the legislature could act immediately and directly on the property owner, and compel him, without compensation, to part with his property by way of a forced gratuity to a private corporation.

The main ground of objection to acts authorizing or recognizing subscriptions by public corporations to the stock of railroad companies is the fact that the debts thereby created will necessitate an additional tax upon the inhabitants and property owners within the limits of such corporations. This will be apparent from an examination of the ablest judgment ever rendered in support of the constitutionality of such subscriptions—I refer to the opinions of the judges of the Supreme Court of Pennsylvania in the *Sharpless' Case.* As the point is important, I verify my statement respecting it by quotations from these opinions. Thus BLACK, Ch. J., who delivered the leading opinion, referring to this subject, says : " The only substantial wrong complained of in the

bill is, that a public debt is about to be created for a purpose which the plaintiffs are unwilling to join in promoting; and that the debt may, and most probably will, involve the necessity of a tax, of which they must pay their share. Except for their liability to this tax they would have no standing in court. This (the liability to be taxed) is the head and front of the offending against them. But, if it be imposed in pursuance of a law passed by the supreme legislative authority of the State, and not in conflict with the Constitution, it must be borne. This brings us so inquire, *what is the extent of the right to levy taxes ?*"

(Per BLACK, Ch. J., in *Sharpless* v. *Mayor of Phila.*, 21 Penn. St. 147, 167.)

He then proceeds to show that the legislation in question, viz.: the statute authorizing a subscription by a city to the stock of a railroad corporation did not, in his opinion, contravene any provision of the State Constitution of Pennsylvania.

In the same case, WOODWARD, J., after stating the question involved to be this: "Had the legislature constitutional power to authorize the city of Philadelphia to subscribe for stock in these railroad companies; to borrow money to pay the subscription, and to levy taxes to pay the loans?" says, "What we have to deal with here, then, is the *constitutionality of laws for taxation.*" Id. 177, 178.

The only other opinion in the case was a brief one by KNOX, J., and the only question he discusses is that of taxation, and he arrives at the conclusion that "There is in the bill of rights no limitation upon the right of taxation," and hence the act is valid.

LEWIS and LOWRIE, JJ., dissented *in toto.*

I have made these quotations and references to show that the main ground upon which the constitutionality

of the law was assailed was in respect to *the tax it authorized*. That court held the law to be valid. This court has held just such a law to be invalid.

It is absolutely impossible, as I think, to hold the act of 1868 to be valid, and yet stand by the decision in the *Wapello County Case* (13 Iowa, 388), which was, that the legislature " could not, under any circumstances, pass an act which will make it lawful for a county or city, in its corporate capacity, to subscribe stock in a railroad company. (Id. 399, 400.)

That, in the *Wapello County Case*, the *tax* was a leading objection to such laws, see particularly those portions of the opinion on pages 404–406. I will not consume time by quoting from it as it may easily be referred to. It is true that other objections to such laws were stated and urged, such as that these public corporations were thereby made shareholders in the hazardous business of railway carriers. But, after all, it is the tax which these laws authorize, or necessitate, which constitutes the main objection to them. I suppose it is perfectly competent for a public or municipal corporation to accept a bequest or donation of stock in a private corporation, and the mere fact that the corporation issuing the stock is engaged in a perilous business does not disable a city or county from becoming a stockholder therein by will or gift, or in any legitimate manner. It seems to me scarcely necessary to spend more time in showing that it is mainly the tax features in these laws that make them objectionable.

I repeat that I see no way to stand by the prior decisions of this court, and yet uphold the act of March, 1868.

This branch of the case is so fully and satisfactorily discussed by my brother WRIGHT in his opinion. that I forbear any further remark upon it, and proceed to a discussion of the constitutionality of the act of 1868 — set

out in full in the statement — upon the merits of the question, and without reference to the decisions of this court respecting subscriptions to the stock of railway companies.

It lies at the foundation of this question to ascertain what the act of 1868, which, I may remark in passing, became a law without the express approval of the able and distinguished gentleman who occupies the executive chair of the State, authorizes to be done. This accomplished, we are then prepared to bring its provisions to the test of the Constitution. The substance of the act of 1868 is, that, if a majority of the voters of any township, city or town, shall, at any special election, vote in favor of aiding in the construction of any railroad located as therein specified, a tax shall be levied, collectible in the same manner as county taxes, not to exceed five per cent upon the assessed value of the property in the township, city or town. This tax, when collected, forms no part of the public revenue, but is to be paid over to the proper railroad company as provided in the act. That the tax belongs wholly to the railroad company is obvious from the provision in the act which allows the tax payer to pay the amount directly to the railroad company, whose receipt will discharge him from the tax.

In passing, I point out, but do not dwell upon, the fact that *any railroad*, without being required to furnish any guarantees of its ability to perform its undertaking, may be thus aided; that the non-tax payer as well as the tax payer may vote; that the elections are to be *special*, which experience shows are usually not fully attended; that there is no limit in the terms of the act respecting the number of railway companies which any one township, city or town may successively aid, to the extent in favor of each of one-twentieth of all the property therein —these are matters showing indeed how loosely the act is

framed, and how much it could be abused, but do not, perhaps, very closely touch the question of legislative power to pass it.

The essential element is, that it is *a tax* which is authorized, and that the proceeds of this tax belong to *the railroad company as its own*, without making any direct return therefor to the tax payer. So that the question is, has the legislature the constitutional power to tax, or authorize to be taxed, the people or property of a township, city or town, and *give* the amount thus raised to any railway company, and to every railroad company which will expend it in the district in which it was laid, or in a contiguous district, in the construction of a railroad. I say *give* the money to the railroad company, for it belongs to it, and neither the tax payer, or the township (which is in fact not an incorporated body), town or city, gets any compensation therefor, and has no interest in the road or its stock by reason of such payment.

So that, I repeat, the question is, has the legislature the constitutional right, by virtue of the taxing power, to raise money from the citizen in this manner, and hand the money thus raised over, as a *gratuity, or bounty, or gift*, to a private corporation organized for pecuniary profit, the tax payer having no interest in the corporation or its stock, by reason of such payment?

Is the power of the legislature so transcendent, and is its arm so strong, that it may put it forth and grasp every man's property, and declare that it will sequestrate five per cent thereof, or one hundred per cent thereof. and donate it to any railway corporation that will locate its road in the district in which the property is situate?

This is the momentous question with which we have to deal, involving no less than the tenure by which every man holds his property.

While it is understood that there is a similar statute in some of the other States, no decision of the question in the form here presented has been called to our attention.

Intelligently to answer this question, it is necessary to see with what guarantees the Constitution has invested private property — to ascertain the limitations upon the authority of the legislature in this respect — and to consider the nature and extent of the taxing power, since it is under this power that this extraordinary legislation is sought to be upheld.

As a judge, I lay claim to no right to annul an act of the legislature, because I deem it unwise or impolitic, or because it does not square with my notion of natural equity and justice. I claim and shall show that the present act violates express provisions of the Constitution.

Many unwise laws, and many laws unjust in their operation, are, nevertheless, no infractions of the Constitution. The wisdom of the legislature does not measure the power of the legislature. Natural equity, as Cicero happily observes, is "the reason of God," made so plain, let me add, that sooner or later all can understand it. Justice has her imperial seat in the bosom of every man, — on these, and not on specific constitutional provisions, must reliance be had in many cases of indefensible legislation — the remedy being to secure a repeal of the law and not its judicial annulment.

But, when a law is a plain and clear violation of a constitutional provision, it is the duty of a judge so to declare, be the consequences what they may.

Of what value, indeed, would be the boasted American idea of securing private rights, and the rights of the minority (for it is usually the minority and not the majority that needs protection) by constitutional limitations on the power of the legislature, i. e., on the power of the

majority, if no tribunal existed to decide when the legis-
lature disregarded these limitations, or if the tribunal
charged with this most delicate yet most important duty
failed fearlessly to perform it.

I proceed to show wherein the act of 1868 violates the
positive and express provisions of the Constitution of the
State.

I first turn to the Constitution of the State to ascer-
tain what property rights are thereby secured to the citi-
zen beyond the reach of legislative power.

By section one (1) of the bill of rights it is declared
that "All men have certain inalienable rights, among
which are those of enjoying and defending life and lib-
erty, acquiring, possessing and protecting property," etc.

Section nine (9) of the bill of rights, borrowing the
substance of a leading provision of *magna charta* de-
clares, that " no person shall be deprived of life, liberty
or property, without due process of law."

Section eighteen (18) of the bill of rights, relating to
the right of eminent domain, declares that " Private
property shall not be taken for public use without just
compensation being first made, or secured to be made, to
the owner thereof, as soon as the damages shall be as-
sessed by a jury, who shall not take into consideration
any advantages that may result to said owner on account
of the improvement for which it is taken."

The last section (25) of the bill of rights is that this
" enumeration of rights shall not be construed to impair
or deny others retained by the people."

It will thus be seen that the right of the citizen to his
property is secured by guaranties as many and as high as
his right to his liberty or his life.

The Constitution recognizes and establishes the invio-
lability of private property, and wisely so, since few in-
terests take a deeper hold on man than those which re-

late to property. Much of the general prosperity and much of the unexampled activity, energy and enterprise which distinguish the present era, is due to the all prevailing conviction that private property is secure.

In what way may the legislature lawfully interfere with private property? In the light of adjudications, I answer, in the following:

2. —— extent of legislative power.

1. It may authorize it to be forfeited for crime, or sold for the owner's debts judicially established, or in pursuance of judicial proceedings.

2. It may take it for *public* use, under the power of eminent domain, but only on condition of making just compensation *in money.*

For any *private* use the legislature cannot touch the property of the citizen, even if it does make compensation. This doctrine is established, and the authorities which declare and sustain it will be found referred to in the recent case of *Bankhead* v. *Brown*, 25 Iowa, 540.

3. It may, under peculiar circumstances, condemn it under the *police power*, when the property, or its use, or situation, is such as to endanger the public health, welfare or safety. *Salus populi suprema lex.*

4. It may be taken by virtue of the *taxing power.*

Except in these modes, and for these purposes, private property is inviolable — is beyond the reach of the legislature.

As the statute under consideration requires the property of the citizen by virtue of the *taxing power*, and that alone, the other modes in which the legislature may interfere with private property do not now concern us.

The nature and extent of the taxing power must now be considered.

Since, as above shown, "every man holds his property subject to the taxing power" of the State (per WOOD-

WARD, J., in *Philadelphia* v. *Tryon*, 35 Penn. St. 401, 404), no question can be of greater moment to the property owner than the one: *what is taxation, and for what purposes property may be lawfully taxed?* This subject is one which I have examined with all the care within my power. In none of the many discussions in the courts to which the railway subscription question gave rise, was this subject examined with that power and fullness which it doubtless would have occasioned had the sole question been, what may the legislature do under the power to tax? It would require too much space to review the many decisions on this subject, and to show the truth of this remark.

Prior to the *Sharpless Case* before referred to, the following cases had been decided holding the validity of municipal subscriptions to the stock of railways: *Goodin* v. *Crump*, 8 Leigh (Va.) 120, 1837; *Bridgeport* v. *R. R. Co.*, 15 Conn. 475, 1843; *Nichol* v. *Nashville*, 8 Hump. (Tenn.) 252, 1848; *Talbot* v. *Dent*, 9 Ben. Mon. (Ky.) 526, 1849.

In some of these the nature of the taxing power is not alluded to, and in the others it is not discussed with any considerable care.

I admit that in the *Sharpless Case* (21 Penn. St. 147), the court examined this subject at length, but, as not less than fourteen millions of stock had then (1853) been taken, and bonds issued on the faith of the legislation of 1848, the court were almost forced to sustain the authority, which was done, however, by a bare majority of the judges. (*Commonwealth* v. *Mc Williams*, 11 Penn. St. 61, 72.) There was also less difficulty in sustaining this legislation because the Supreme Court of that State, under the influence of Chief Justice GIBSON, had before enunciated extreme notions as to the extent of the legislative power — notions some of which are not law else-

where, and which practically invest the legislature with despotic power. In illustration of what I mean, I refer to the following cases: *Eakin* v. *Raub*, 12 Serg. & R. 344; *Harvey* v. *Thomas*, 10 Watts, 63; *Pocopson Road*, 16 Penn. St. 15; *Kirby* v. *Shaw*, 19 id. 258.

The period intervening between 1853 and 1857 was one of apparent general prosperity, and characterized by great activity in railroad enterprises; and other courts, in which the question of the power of public corporations to subscribe to the stock of railway companies subsequently arose, took shelter under the *Sharpless Case*, and those that preceded it.

But, as I have before said, it may be admitted that those decisions can be sustained without the admission necessarily involving a concession that the act under consideration is within the constitutional power of the legislature.

I now proceed to examine the nature and extent of the legislative power to tax. I think I shall be able to convince the impartial judgment of any lawyer or intelligent man, that the act of 1868 is not a valid or legitimate exercise of the taxing power; that though the money demanded of the citizen is called a *tax*, it is not such, but is, in fact, a coercive contribution in favor of private railway corporations, and violative, not only of the general spirit of the Constitution as to the sacredness of private property, but of that specific provision which declares *that no man shall be deprived of his property without due process .of law* (Bill of Rights, § 9) — a provision which is adequate to protect the owner from being despoiled of his property by an unauthorized tax law or illegal tax. See Cooley on Const. Lim., p. 487, also pp. 479, 521, and cases cited.

In examining the legislative power to tax, I may not extend this opinion by taking the time to trace, at any

length, the history of taxation, although it is a topic full of interest, and one which sheds no little light upon the subject in hand. It must suffice to state, that regular and systematic taxation, by means of law, is of modern origin. In feudal times, the sovereign was maintained by the revenues of his domains, and supported, in war, by his military vassals. When feudalism decayed, and the wants of government increased, other sources of revenue became necessary. Before the modern system of regular and equal taxation was settled, resort was had to forced loans, to confiscations, the sale of monopolies, etc. These arbitrary proceedings led, in England, to a long and memorable struggle, in the course of which Charles I lost his crown and his life, and James II was driven from the realm, and which resulted in the solemn establishment of the principle, now firmly imbedded in the English Constitution, that there can be no lawful taxation .without the consent of the people, represented in parliament. This principle has been universally adopted in this country. So that, while taxation is an incident, or attribute, of sovereignty, it can only be exercised by the authority of the legislature. Our Constitution (art. 3, § 1) vests " *the legislative authority* of the State in the general assembly." As taxation is a legislative power, it passed to the legislature by this general grant of legislative authority. So far, there is no dispute.

4. — the taxing power.

The next step in the inquiry is, *What is the taxing power?* I answer, the power to levy and collect taxes, and assessments in the nature of taxes.

*What are taxes?* This is the question which lies at the heart of the present case. I answer, that, by the concurrent opinion of lawyers, judges, lexicographers, and political economists, as well as by the general and popular understanding, *taxes are*

5. — what taxes are.

Hanson v. Vernon.

*burdens or charges imposed by the legislature upon persons or property to raise money for public purposes, or to accomplish some governmental end.* Some of the many authorities for this doctrine or definition are cited in a note ;* but I do not stop in the thread of my argument to quote from them. I add, that no authority, nor, as I believe, even *dictum*, can be found, which asserts that there can be any legitimate taxation where the money to be raised does not go into the public treasury, or is not destined for the use of the government or some of the public governmental divisions of the State. In other words, a *public governmental use or purpose* is involved

---

* " A TAX is a portion of the property of individuals which is taken from them by the government, and disposed of by it." 21 Ency. Britt. 37.

" TAX. A rate or sum of money assessed on the person or property of a citizen. by government, for the use of the nation or state." Webst. Dict.

" TAXES are contributions paid by the inhabitants of a country for the use of the government." New Am. Ency. vol. 15, p. 307.

" A TAX is generally understood to mean the imposition of a duty or impost for the support of government." *Pray* v. *North Lib.*, 31 Penn. St. 69.

" TAXES are burdens or charges imposed by the legislature upon persons or property to raise money for *public purposes.*" Cooley on Const. Lim. 479.

Again: Judge Cooley remarks (id. 487), " *Taxation* having for its only legiti mate object the raising of money for *public purposes and the proper needs of government*, the exaction of money from the citizen for other purposes is not a proper exercise of the power,'and must therefore be unauthorized." I invite attention to the entire remarks of this able and distinguished jurist in this connection.

A TAX was anciently defined to be a certain aid, subsidy or supply granted by the Commons of Great Britian, and constituting the King's revenue. 4 Inst. 216–233. As the name imports, from its derivation, it means tribute, and belonged to the King's treasury. *And I think the common mind has everywhere taken in the understanding that taxes are a public imposition, levied by authority of the government, for the purpose of carrying on the government in all its machinery and operations ; that they are imposed for a public purpose.* Per COULTER, J., in *North Lib.* v. *St. John's Church*, 13 Penn. St. 104, 107, 1850.

TAXATION is the mode of raising money *for public purposes or uses. Matter of Mayor of N. Y.*, 11 Johns. 77, and authorities cited ; Blackw. on Tax Titles, ch. 1, p. 77 (1st. ed.).

" A TAX is an impost levied by authority of government, upon its citizens or subjects, for the *support of the state*. It is not founded upon contract or agreement. It operates in *invitum.*" Per Chief Justice GREEN, *Camden* v. *Allen*, 2 Dutch. 398.

in, and is essential to, the idea of a tax. "I concede," says BLACK, Ch. J., in *Sharpless' Case* (21 Penn. St., 167), " that a law authorizing taxation for any other than public purposes is void." Again, he says: "A tax for a *private* purpose is unconstitutional, though it pass through the hands of public officers." This is undoubtedly true. The reasons why such legislation is void will presently be stated.

A tax for a *private* purpose is, to use the strong, yet apt, expression of LOWE, J., in the *Wapello County Case* (13 Iowa, 405), " a solecism in language."

That taxation must have reference to the raising of money for *public*, as distinguished from *private*, uses and ends, appears from the nature of the power and the manner in which it is exercised. Other laws are based upon convenience; but tax laws are based upon an imperative political necessity, for without revenue there can be no regular government, and without taxes no revenue. In theory the tax payer receives a compensation for the taxes paid, in the protection the government affords him. This is theoretically true; but still the foundation of the taxing power is political necessity, and taxes are in effect, as Mr. MILL contends, sacrifices made for the public good, " equality of sacrifice " being the rule dictated by justice. 2 Pol. Econ. 370, 372.

It is the circumstance that taxes are contributions demanded for the *use of the government*, and not for private uses, that confers upon the power to tax its peculiar character.

It extends to all the property and all the persons within the jurisdiction of the State.

For the non-payment of a lawful tax, the property of the citizen may, without any judicial proceedings, and without personal notice to him, be sold to pay it. Proceedings so rigorous are anomalous in the law, and justify

Hanson v. Vernon.

the remark of the Supreme Court of Pennsylvania, that the divestiture of ownership by tax laws and sales thereunder, exhibit "the instance in which a constitutional government approaches most nearly to an unrestrained tyranny." *Gault's Appeal*, 33 Penn. St. 94, 97, 1859.

It is only because *taxes* are for the use of the public—of the government or some of its auxiliaries—that these severe and stringent laws are not condemned as cruel and despotic, and as infringements of constitutional rights.

Again: that taxation contemplates only the raising of money for *public ends and uses* is further shown by the extent, *as respects the rate and amount*, to which it may be carried.

7. —— limitations on the taxing power.

· " If the right to impose a tax exists," says the Supreme Court of the United States, "it is a right, which in its nature acknowledges no limits." *Weston* v. *Charleston*, 2 Pet. 449; *Bank of Commerce* v. *New York City*, 2 Black, 631; see also *Warren* v. *Paul*, 22 Ind. 279; *Herrick* v. *Randolph*, 13 Vt. 529; Sedgw. Const. Law, 554, 555; Cooley Const. Lim. 482, 483 and cases cited.

Why is legitimate taxation without limit? Because the needs of the public or the necessities of the government can have no bounds set to them. Unless there is some limit fixed in the Constitution, the State may, for any legitimate purpose, tax property to its full value.

" The power to tax," says Chief Justice MARSHALL, (*McCullough* v. *Maryland*, 4 Wheat. 431), "involves the power to destroy," that is by the levy of a tax equal in amount to the value of the property taxed. So that, if the present law, which authorizes a five per cent tax for the benefit of a railroad company, be constitutional, then a law authorizing a tax of 100 per cent for a similar purpose would likewise be valid.

The point I make in this branch of my argument is, that, in view of the nature of the taxing power, extend-

ing to all persons and all property, without limit as to
rate or amount, involving, indeed, the power to destroy;
the right to sell without notice and without judicial
proceedings, it is against reason to suppose that any
such power exists in order to raise money from the un-
willing citizen for the benefit of a private corporation.

The Supreme Court of the United States have correctly
said that there is no limitation (in the absence of express
provisions of the State Constitutions) upon the legisla-
tive power of the States, as to the *amount* (rate) *or ob-
jects* (the property subject to be taxed) *of taxation.
Providence Bank* v. *Billings*, 4 Pet. 514.

But no court has ever said that there is no limitation
upon the legislatures as to the *purposes* for which a tax
could be authorized.

The case is precisely like that arising under the power
of eminent domain. The right to take private property,
so far as necessary for public use, knows no bounds, pro-
vided compensation be made.

Respecting the *expediency* of exercising the power of
eminent domain, the legislature is the sole, final and un-
controlled judge; this being a political and not a judi-
cial question. But whether the *use* for which the statute
proposes to take the property of the citizen be *public* or
*private*, is a judicial question, concerning which the de-
termination of the legislature, while entitled to great re-
spect, is not conclusive. *Bankhead* v. *Brown*, 25 Iowa,
540, and cases cited.

The act of 1868 presents the case of the levy of a tax
for a specific, designated purpose. Whether this pur-
pose be *public* or *private*, whether the money thus re-
quired is in the nature of a tax or is an illegal exaction
under the name and guise of a tax, are judicial questions.

So that the controversy is now narrowed down to this
single point: Does the act of 1868 authorize a tax to be

Hanson v. Vernon.

levied and collected for *private* purposes? If so, it is not a tax for the reasons before stated, and the statute is void, since it seeks, in violation of the bill of rights, to deprive a person of his property *without due process of law*.

It is a well-settled principle of American constitutional law that an act of the legislature may be unconstitutional 8. —— different in two ways: first, because it assumes or kinds of un-constitutional seeks to confer power not legislative in its laws. nature; or, second, because it violates some specific provision of the national or State Constitution. *Commonwealth* v. *Maxwell*, 27 Penn. St. 444, 456; *Mott* v. *Pennsylvania Central R. R. Co.*, 30 id. 9, 37, per KNOX, J.; Sedgw. Const. Law, 174, 175, 515; *Taylor* v. *Porter*, 4 Hill (N. Y.) 140, per BRONSON, J.

The act of 1868 is, in my opinion, unconstitutional in both of these ways. Because it appropriates private property to private purposes it is not in the nature of a law, and, therefore, deprives the citizen of his property without due process of law.

I adopt, as expressive of my views, the language of Mr. Justice BRONSON, in *Taylor* v. *Porter*, 4 Hill, 140, whose opinion, I may remark, has Mr. Sedgwick's weighty indorsement, as "a clear, accurate and sound exposition" of constitutional law. Sedgw. Const. Law, 155, note. The legislature of New York had undertaken to author-ize the condemnation of private property for *private roads*. In holding that this cannot be done, he ob-serves: "The security of life, liberty and property lies at the foundation of the social compact; and to say that the grant of "legislative power" includes the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which governments were established. * * "They (the legislature) cannot

take the property of A., either with or without compen-
sation, and give it to B.   The 'legislative power of this
State' does not reach to such an unwarrantable extent.
Neither life, liberty nor property, except when forfeited
by crime, *or when the latter is taken for public use, falls
within the scope of legislative power.*"

On this ground, and on the ground that the act in
question deprived the citizen of his property without
"due process of law," and against " the law of the land,"
it was held unconstitutional and void.

This case was subsequently cited with approbation in
*Powers* v. *Bergen*, 2 Seld. 358, and was followed and
approved in a similar case by this court in *Bankhead* v.
*Brown*, before cited.

It is established by the foregoing principles and author-
ities, that, unless the tax authorized by the act of 1868
is one laid for *public purposes*, the law cannot be sus-
tained.

I argue that it is not a tax laid for *public* purposes,
because the donee thereof is a mere *private* corporation,
voluntarily organized for pecuniary profit, and whose
ultimate business is that of a mere common carrier.   The
"leading features and characteristics of a railroad cor-
poration " in respect to its private character are so well
portrayed in the *Wapello County Case* (pp. 400–402), that
it is really unnecessary to do more than to refer to it as
correctly expressing the law on this point.   If the legis-
lature could abolish railroad corporations, restrict their
chartered powers, and control their rights and property,
the same as they can do with respect to municipal or civil
corporations, there would be some ground for holding
that they were not essentially private.   If these corpora-
tions are not private, then they are *public*, and, if public,
they are subject to the unlimited control of the legisla-
ture, which may enlarge or restrict their rights and

powers, or even abolish or destroy them at its pleasure, a doctrine, the correctness of which these corporations would, in any other case, be the last to admit. That such corporations are private, and not public, is a principle of law so well settled that it has not even been questioned by counsel. No case can be found which denies it.

It is to be remembered also, that railway corporations are not organized for the purpose of developing the material prosperity of the State; this is a mere incident of the business they prosecute. But they are organized solely to make money for their stockholders, and the legislature have no more power over their property or rights than it has over the like property and rights of natural persons, or other private corporations organized under the same general law.

How it can be said that the voluntary use of private capital, for the exclusive advantage and profit of those who contribute it, is a *public use* of it, justifying compulsory taxation in favor of the private undertaking, surpasses my ability to understand.

Because the legislature does not, and indeed cannot, compulsorily organize persons into a railway corporation, but their action in forming such a corporation is, and must be, purely voluntary; because the State cannot compel a railway company, in the absence of a contract on its part, to build its road, but it may abandon its enterprise at pleasure; because the State does not own the stock, but the same is the private property of the stockholders; because the State is not liable for the torts or the contracts of railway companies; because it derives no dividends or profits from the operation of the roads, but the same belong wholly to the stockholders, it follows that railway corporations are purely private, and their undertakings can no more be aided by taxation

than can the private undertakings of any other corporation, or of an individual. All corporations are created or authorized by the legislature because of the supposed public benefit that will result therefrom; but the notion that, therefore, it is competent to *tax* the citizen for the benefit of such corporations is entirely of very modern origin, is subversive of private rights, and, in my judgment, dangerous beyond conception. *Ten Eyck* v. *Canal Co.*, 3 Harr. (N. J.) 200, 203.

I notice in conclusion a few of the more plausible objections to the soundness of the foregoing views.

It is argued that taxes authorized by the law under consideration, are levied and collected for public purposes because the right of eminent domain can be exercised in favor of railroad companies. There is plausibility enough in this suggestion to justify an answer to it.

It overlooks the fact that the taxing power and the right of eminent domain are, though in some respects kindred, essentially different.

Property may be taken under the taxing power without making any direct compensation whatever, the foundation of this power being, as above shown, in an absolute political necessity, the compensation to the tax payer being merely theoretical and incidental. Property, by virtue of the power of eminent domain, can only be taken when direct and full compensation is made in money, and can only be taken to the limited extent required by the object in favor of which it is exercised. The leading case on this subject is *The People* v. *Brooklyn* (4 Comst. 423, 425), where the distinguishing attributes of the two powers are very clearly stated by Mr. Justice RUGGLES.

The two powers being different, it does not follow that a tax can be levied for the benefit of any private enterprise, though the enterprise be one which would justify the exercise of the right of eminent domain.

Because the legislature may take enough of A.'s land to enable a railroad company to build its road, provided A. be paid in money the full value of the land, and any additional damage that the taking may do him, it does not follow that A. can be taxed to build the road without receiving or being entitled to any return for the money he is thus compelled to pay. The cases are obviously different.

The difference may be exemplified by an example or two, derived from actual adjudications.

Under the right of eminent domain, it has been held by the Supreme Court of Massachusetts, that, on making compensation to the owner, land may be compulsorily taken for the establishment of a great mill power for manufacturing purposes. *Hazen* v. *Essex Co.*, 12 Cush. 475, 477. It has also been held, that land may be thus taken for a public grist-mill (*Harding* v. *Goodlet*, 3 Yerg. 41), and for mill-dams (*Newell* v. *Smith*, 15 Wis. 101), and the like. We have also statutes authorizing the condemnation of property for bridges and works of internal improvement (Rev. ch. 54, 55), and authorizing mill-dam owners, on paying damages, to flood the supra-riparian proprietors. Rev. 211.

Conceding, for the argument, that these and similar decisions and statutes are sustainable, will it be contended that citizens can be taxed, and against their consent compelled, to pay money to a man, or company, or private corporation, proposing to erect " a great mill power for manufacturing purposes," or " a public grist-mill," or to reimburse mill owners the amount which they will have to pay under the *ad quod damnum* act ?

If this is not claimed, then the argument I am answering, viz., that there is a right to tax where there is a right to exercise the power of eminent domain, is shown to be unsound. If this is claimed, then the startling and dan-

Hanson v. Vernon.

gerous consequences to which the proposition leads equally demonstrate its unsoundness.

Our statute (Rev. § 1278) authorizes "any person or corporation designing to construct a canal, or a railroad, or a turnpike, graded, macadamized or plank road, or a bridge, as a work of public utility, although for private profit, to take such reasonable amount of private real estate as may be requisite for a right of way not exceeding one hundred feet wide, upon paying therefor," etc Can the legislature tax the citizen and compel him to assist "any person or corporation" designing to construct such works for private profit? Who is bold enough to claim it? I deny that it can be done. The property that can be taken by the exercise of the right of eminent domain is restricted to the actual amount required to execute the undertaking, and is generally limited to one hundred feet in width, and full value in money must be paid. This itself is a check against the abuse of the power. But the amount of tax that may be levied is unlimited, and no return or compensation to the tax payer is contemplated. Indeed, the very object of the act of 1868 is to get the money of the property owner without being obliged to make any compensation to him therefor.

Again, it is urged in support of the act of 1868 that railways are simply improved highways, and that taxes in aid of their construction stand upon the same principle as ordinary road taxes; that since the State might itself build a railroad and pay for it out of the public revenues raised by taxation, so it may, if it chooses, authorize such taxes in aid of private railway corporations. This argument is unsound. The ordinary highway is the common property of all, for the common use of all, and the jurisdiction and control over it on the part of the legislature, as the representative of the public, is absolute and unlimited. In all of these respects a railway is different.

That because the State may itself build a railway and own it (see, however, art. 7 of Constitution), it is a *non sequiter* to suppose it can authorize the citizen to be taxed for the benefit of a private corporation organized for pecuniary profit.

Let me illustrate.  The State may levy a tax to support common schools.  Can it levy a tax, or authorize a majority in a town or city to vote a tax to support the private school kept by Mr. A. or B. ?  I think not. Other illustrations will readily suggest themselves, and I will say no more in response to this argument, except to refer to the answer it received in the *Wapello County Case.*

Some argument in favor of the validity of the act under consideration may, it has been suggested, be drawn from the fact that courts have sustained laws authorizing the giving of bounties to soldiers volunteering to defend the country in time of actual war, and the levying of taxes to pay such bounties.  I believe the difference between such a case and that of a compulsory donation to a private railway company is so distinctly pronounced and obvious that I may safely leave the argument to answer itself.

The legislation under consideration is, I think, to be distinguished, on the principle involved, from the ordinary case of municipal assessments for local public improvements, such as sidewalks, etc., and is not necessarily identical with that in which the legislature has authorized some specific public work, such as draining marshy lands, to be done through the intervention of a company, and the expense assessed upon the lands benefited.  *Draining Co. Case*, 11 La. Ann. R. 338.

Nor will a denial of the constitutionality of the act of 1868 be equivalent to holding that the legislature could not, if it deemed it for the public good, and complied with the requirements of the Constitution (art. 3, § 31), give public aid to local or private objects.

Such a case is contemplated by the Constitution, and the legislature in exercising this power decides that the object aided deserves public assistance; a very different case from a general act authorizing a majority of a local district to vote a tax as a bounty to a private railway corporation.

I will not further elaborate the argument. The legislation in question cannot be sustained. It is the duty of a judge to look at this statute in the light of the principle which gives to it its distinctive character.

The court cannot uphold the tax in question without sanctioning the following principle, viz. : *That it is competent for the legislature, because of the incidental advantage which would result to the community from the carrying out of the objects of a voluntary private railway corporation, organized for pecuniary profit, to authorize a tax to be levied on the citizen and his property, to be given as a bounty to such private corporation, to be used in aid of its undertaking, without any pecuniary compensation to the tax payer being contemplated or provided.* Such a doctrine would unsettle the foundation of private rights. The citizen would no longer own his property in fee simple, but hold it as a tenant at the will of the majority of the local community in which it is situated.

If, because of the incidental advantage to the community resulting from the construction of its road, and the pursuit of its business, by a railroad company, the citizen and his property may be specially taxed to aid such company to execute its undertaking, who can define the logical boundaries to this doctrine? Who can fix the limits to this kind of taxation? Who can foresee the consequences of such a decision? Railroad enterprises are not the only ones that would result in a consequential benefit to the public. On the contrary, political economists tell us, and our reason and observation confirm it, that agriculture, commerce,

the mechanic arts, in a word every department of labor and every industrial pursuit promotes the public good by advancing the public prosperity. Manufactures of various kinds are scarcely less needed in Iowa, to-day,. than railroads. As in the case of railroads, it requires large capital to build and operate them. Can the legislature authorize a tax as a bounty or gratuity to private persons or corporations proposing to erect manufactories? That it could authorize this, or any like taxation, could not be denied, were the present legislation sustainable. One of the counsel has drawn, in eloquent terms, a graphic picture of the disastrous effects, in retarding the growth and development of the State, of holding the act under consideration to be invalid. As such considerations have no place in the judicial determination of the question, except to superinduce greater care and more sedate deliberation, I dismiss them, with an expression of my disbelief in the dangers which are apprehended, of my skepticism in the healthfulness of an artificial growth caused by the unnatural stimulus of public taxation in favor of private enterprises, and of my firm conviction that any benefits resulting from a different holding would be dearly purchased at the expense of the fundamental rights of the citizen. This opening once made in the barriers which the Constitution has erected to protect private property, who is so wise as to foretell what troops of foes may not hereafter enter at the same breach? And who, in such an event, will be strong enough to prevent it? My convictions as to the illegality of the law are clear and decided, however imperfectly I may have expressed and vindicated the grounds on which they rest.

I entertain no doubt, however the decision of the court may, for the present, be regarded or regretted, that, finally, the professional and general judgment of men will assent to its correctness, and that its views as

to the inviolability of private property and as to the nature and legitimate purposes of taxation will be laid up among the fundamental, acknowledged and cherished axioms of American constitutional law.

It follows, that, in my judgment, the plaintiffs were entitled to the maintenance of the injunction they had procured, and that the court erred in dissolving it.

WRIGHT, J.—At the last session of the general assembly of this State, an act was passed " to enable townships and incorporated towns and cities to aid in the construction of railroads." Laws of 1868, ch. 48, p. 54.

By this act it is provided, that it shall be lawful for any township, etc., through which, etc., *to aid in the construction thereof, as hereinafter provided.*

A petition being presented to, etc.,  *  *  signed by *one-third* of the resident tax payers of such township, etc., asking the question of aiding in the construction of any railway to be submitted to the voters thereof, it shall be the duty of, etc.,  *  *  to give notice of a special election;  *  *  and if, at such election, a majority of the votes polled shall be " for taxation," then the township trustees shall determine the per centum,  *  *  cause the same to be certified, etc. — not, however, to exceed five per centum upon the assessed value of the property in such township, etc.

When the tax lists are prepared, the tax in said act provided for and voted shall be due and collectible;  *  *  and it shall be the duty of the county treasurer, when the same is certified, to collect the same and pay it into the treasury of the county. The money thus collected is to be paid out by the treasurer upon the order of the president, etc., of the railroad company, " whose said road it is voted to aid." The tax so raised is only to be expended to aid in the construction of the road *within*

such township, or the one *contiguous* thereto, as near as practicable. If any tax payer shall produce to the treasurer a voucher of the proper officer of the railroad company, showing the payment of the tax, he shall be discharged, etc.

Under this law the township of Center, in Henry county, on the first day of July, 1868 — the trustees being petitioned therefor — held a special election, at which, as is claimed, a majority of the voters determined to vote a tax of *two and one-fourth per cent*, to aid in the construction of the "Keokuk Northern railroad."

The plaintiffs are tax payers of said township; defendants the trustees and clerk thereof. By the petition, it is aimed to enjoin the trustees from certifying this vote, to restrain the collection of this tax, upon various technical and special grounds, and also upon the general one that the *act*, under which the said vote was taken, was unconstitutional, etc. The injunction was granted, and afterward, upon the coming in of defendant's answer, and upon their motion, was dissolved, and plaintiffs appeal.

The facts stated show, that the general question involved is one of State, and not merely of local, interest. It has 9. —— legisla- hence occurred, that it has been argued in tive power. writing, in print and orally, by other counsel than those named, interested not in this case, but in the validity of the statute under consideration, in virtue of which other votes have been, or were about to be, taken, to aid still other roads. We therefore come to its consideration and determination aided by more than the usual array of counsel, and have given to it more than ordinary thought and reflection.

There are many questions of a minor nature brought to our attention by counsel, which, if allowed their due weight, might result in sustaining or defeating this particular application, or which might sufficiently dispose of

this case without reaching the vital and paramount issue involved.   As I am conscious that parties prefer that the main issue shall be reached; as I am aware that the policy and true interest of the State demands that it shall receive an early disposition; and as counsel substantially agree in asking this, I leave untouched all other questions, and come at once to that which involves the constitutional validity of the statute.

Those who have followed and given attention to the views entertained by me, and expressed in the many decisions of this court, upon the subject of " *county* railroad votes and bonds " will surely be prepared for the announcement that I regard this law as unconstitutional and void.   To hold otherwise, I should have to repudiate my whole judicial life on this question, and stifle the convictions of my earlier as well as later professional and judicial years.   And so, too, I should, as I sincerely think, be compelled to disregard the repeated and now settled rulings of this court.   Let me refer to what I have said, and what this court has ruled.

*Clapp* v. *The County of Cedar* (5 Iowa, 15) involved the question of the right of the county to *levy a tax* to pay certain bonds issued in aid of a railroad, etc.   In a dissenting opinion, I said that " I am equally clear that a majority of the voters of a county have no inherent power to determine that the entire population shall be taxed for the purposes contemplated in this instance. Nor am I prepared to admit that, under our Constitution, the legislature can confer such power."   This was in 1857. In 1858 (*Ring* v. *Johnson County*, 6 id. 274), I held that the county had no power to issue the bonds, etc.   In *Stokes* v. *Scott County* (10 id. 171) I denied " that, *under the Constitution*, the legislature could confer the power upon the counties " to vote such a tax.   I also held that a majority had no *inherent right* to subject the property

Hanson v. Vernon.

of a *minority* to seizure and sale for the payment of such a burden. And this latter view was not then objected to by any member of the court.

If the subsequent case of *The State ex rel.* v. *Wapello County* (13 id. 388) did not adopt these views, then I do not understand the language used, nor apprehend the general, universal, and professional construction given to the same. And this is especially so in the light of the numerous cases following it (especially the late and thoroughly exhaustive one of *McClure* v. *Owen*, 26 Iowa, 243), and the admitted present and deplored conflict between our State and the Federal Courts. That I do not misapprehend, I quote from the opinion (13 Iowa), what, I may be allowed to say, the more I examine, the more I am impressed with its justice, force and correctness. It is there said: "The case raises a question which goes back of the statute; which must find its solution * * * in the judgment of each court, in view of its connection with, and bearing upon, the great *fundamental* and *reserved rights* of the citizen. * * * This brings us to the inquiry, whether the legislature can, under any circumstances, pass a valid law * * * for a county or city, in its corporate capacity, to subscribe stock in a railroad. * * * The citizens of a county cannot be taxed separately for an object in which the public at large is generally interested; nor, on the other hand, should the whole State be taxed for an object partial and limited in its benefits to a single county." * * * "All this the people of this country very well understand, and have readily acquiesced in the taxing power without complaint, as it has generally been exercised. Nor has there been much conflict of opinion respecting what are, and what are not, legitimate objects of municipal regulation and superintendence, until cities and counties began to involve their citizens in heavy liabilities in subscribing,

in their corporate capacities, in ᴠrailway companies."
And then, after referring to the fact that the power
could not, in any event, be exercised without a special
grant for that purpose, it is said, that the power is
" wholly unjustifiable, and is not, and cannot be, derived
from the revenue power of the county at all. Why? * * *
Because it (the revenue) must be applied through the
regularly constituted agents, to *public* and not to *private*
objects; that is to say, to matters pertaining to the
*internal policy* of the county, in which all the citizens
have a *common interest.*" * * * " The tax, when collected,
goes into the treasury of a private railroad company,
is alone controlled and paid out by its officers. To call
it, under such circumstances, a *county tax, is simply a*
*solecism in language.* The true test to determine the
character of a particular *fund* is the *use* to which it is
to be applied, and not the *name* that may be given to
it, as a pretext for raising the same under the cover or
pretense of a tax." * * * Almost from the necessity of the
case, municipal corporations must move in their appro-
priate and prescribed orbits, outside of which they have
no privileges, nor can they legitimately exercise any
power or superintendence, unless in a *few* exceptional
cases, touching quarantine regulations, the supply of
water to cities," etc.

Than these quotations I am sure I need not give more
to show the general purport and clear bearing of the
opinion. And I am fully justified in saying that these
views have never been denied by any member of this
court in all the decisions upon the general subject, both
prior and subsequent to that case. This has been regarded
as authoritatively settling the power of municipal corpora-
ations under the Constitution on the subject of taxation.

That this is so, and to show that these views have been
repeatedly sanctioned by this court, I quote, briefly, still

Hanson v. Vernon.

further. *Myers* v. *Johnson County* (14 Iowa, 47) follows unhesitatingly and without comment the case last cited. *McMillan* v. *Boyles* (id. 107) is somewhat peculiarly in point, when the facts are remembered. This court had held the tax voted illegal, because of certain irregularities. 3 Iowa, 311. The legislature passed a curative act, and we then held that it was competent for the legislature to · pass *such an act*, and that the vote was thereupon vested with the same force and validity as though the power had been antecedently given in terms. And afterward certain parties, by their bill in equity, sought to restrain the collection of such tax, because it was in contravention of both the law and Constitution. And it was held in the case I am now citing (14 Iowa, 107), (following the case in 13 Iowa, and relying upon that and that alone), that there was no power under the Constitution to collect the tax, and that the citizens were not bound.

*Rock* v. *Wallace* (id. 593) stands alone upon the authority of 13th and 10th Iowa. (The Stokes' case.)

Following these is *Smith* v. *Henry County*, 15 id. 385. And it is there said that they (the former decisions) were not hurriedly made, nor without a due impression of their importance. * * * " The want of power (continues the opinion) under our *Constitution* and laws is too clear, and the argument against the right to exercise it is so well sustained and conclusive, as we have attempted to show in the cases above cited, that we cannot longer regard it as open to controversy. In *this State* it must be considered as *settled*."

*Ten Eyck* v. *The Mayor*, *etc.* (Id. 486) says there are no grounds for changing the former rulings, and the city (Keokuk) was hence restrained from collecting the tax.

*Chamberlain* v. *The City of Burlington* (19 id. 395) cites all the preceding cases, and says that the court unanimously denied that the counties were clothed with

the power; and the language used in *Smith* v. *Henry County* (*supra*) is quoted with approval. It is also further said, that those cases hold "that counties have no *constitutional or legislative* authority to bind themselves by the issuance of bonds for railroad stock."

And then, in the very recent case before cited (*McClure* v. *Owen*, 26 Iowa, 243), where the position of this court is restated, and especially in view of the decisions made by the federal courts, it is said that "this court has often held, that, under the *Constitution* of the State, bonds of this character (the proceeding was to restrain the collection of a tax to pay certain county bonds issued for the purpose of aiding the construction of a railroad) cannot be issued by counties and municipal corporations; that contracts of this kind are unauthorized, and cannot therefore be enforced." * * * "The *principles* of these decisions (referring to all of them), independent of their authority, have the unqualified approval of this court as now constituted."

I have thus shown, as I think, if any thing can be made conclusive and clear upon authority, that this court has repeatedly, by decision after decision, denied the right of *counties* to take stock, issue bonds therefor, and tax the people for the purpose of paying the same. And this, not because alone of a want of legislative, but of constitutional, power. Surely, no one can doubt that this is the accepted and understood position of the State, at this time, in all the courts, State and Federal, of the land.

But it is said that the leading case (*B. and M. R. R. Co.* v. *Wapello County*, 13 id. 388) is based exclusively upon the ground that the county, by the step proposed, or vote taken, incurred certain liabilities as a *stockholder* in a company carrying on the business of a common carrier, and that this, in that and in all the cases, would have been legal enough, if it had been voted or *given* in *aid*

of the several enterprises, taking no stock in return. I certainly do not so understand the reasoning. This, I grant, is a part of the argument. But it is urged as an *additional* reason for the conclusion reached, and by no means the *sole* one. If this were the only difficulty in the way, I doubt not railroad companies would cheerfully take the tax and retain the stock. And it certainly can not be, *so far as the power to tax is concerned* (and this is the real question in all the cases as in this), that it will be legal if *given* for the general benefit, or for a *general consideration* alone ; and illegal if, in addition thereto, the people or county receive a consideration in the *form of valuable stock.* The announcement of such a distinction will be as gratifying to railroad companies, as I doubt not it will be damaging to counties, and surprising to the profession.

Nor can it be that *townships* can be thus taxed if *counties* cannot. This no one would certainly claim. If the powers of the counties are limited, those of townships are even more so. Counties are bodies corporate, and may sue and be sued. Not so with townships. The rights reserved and secured to the *people* are just as well guarded and sacred in the townships as in the counties. So far as we may look at the hardship and unreasonableness of the law, the argument is stronger against this than if it applied to counties. There are greater opportunities to carry the tax by illegal votes, and there are fewer checks and guards upon the disposition of the funds raised. For that matter the checks under this law amount to nothing. These considerations, however, go to the policy of the statute and not its validity. I mention them as showing, under the former rulings of this court, how vulnerable it would be to objections if it applied to counties.

But I propose to look at the question aside from the

adjudged cases.   And this I shall do the more hurriedly, as the opinion of the chief justice discusses and covers the more general ground of power.

I shall assume that this tax has the same, and no other or greater, validity than if assessed by the township authorities, under a general law, without any vote of the people.   In other words, I shall take it for granted that the vote gives it no additional constitutional validity. The legislature would have the same power to say that every township in the State through which, or one contiguous, a railroad was located, should pay one or fifty thousand dollars to aid in its construction, to be collected by tax, etc., or to say that the township trustees might, at their election, levy a tax for such purpose, not to exceed five per centum.   For the popular vote does not give it any additional validity.   It is the right of the *citizen* to be protected against the proposed burden we are considering; and if it cannot be imposed by direct legislation, decree or order, neither can it be by a popular vote.   The right of the minority, of every and each individual, to be secure against unconstitutional enactments, is just as sacred as that of all; and this right cannot be *voted* away by his neighbors any more than it can be legislated away by the general assembly.   Thus, to illustrate, if the legislature should provide that the people of a township should pay so much tax to assist Jones, or Reed, or Smith to build a mill, a distillery, or a saloon, everybody would say that could not be done.   And no more could it by the vote of a majority, under the requisite legislative act.   If the attempted taxation, therefore, is good *with* the vote, so it would be *without* it.   If *bad* without it, so it is *with* it. And I shall thus treat the question, without, of course, denying the abstract fairness or justice of their submitting such matters to the arbitrament of the popular will. To this, when constitutionally expressed, it should be the

pleasure, as it is the duty, of all, under our form of government, to bow with due submission. If not thus expressed, then the rights of no one can or should be affected.

I place my objection to the proposed levy, not upon the ground that it is *taking private* property for public use, without just compensation, and thus infringes the Constitution. In my opinion, this constitutional provision does not refer to such cases. If a *taking* of any kind, it is of private property for *private* use, and, hence, unwarranted.

But my objection is, that the legislature has only the power to raise revenue by taxation for a *public purpose ;* and, when it is raised for a purpose not connected with the public interest, it is no longer taxation. And the attempt is as clearly unconstitutional as any act could be which is expressly prohibited by the Constitution.

I grant the rule that the authority to determine what is, or is not, a public purpose is in the legislative department. But this authority is not without limit. It cannot be, in the very nature of things. Conceding, as I do, the largest liberality in this respect, by no means desiring to apply any technical or narrow rule in measuring the exercise of the power by the legislature, fully appreciating the duty of the courts in looking at and judging of the acts of a co-ordinate department of the government, I nevertheless believe that they must determine whether, in a particular case, the burden imposed is for a private or a public purpose. I know of no reason why the legislative action should be any more absolutely conclusive, in such cases, than in many others where judicial action is invoked. A stronger case might have been made out; the abuse of the power imposed might have to be more clearly apparent; but if the judicial mind is brought unhesitatingly to the opinion that

the purpose sought to be aided by the tax is not, within the meaning of the Constitution, *public*, it is the unquestionable duty of the court to interfere. If not so, then this great, delicate and dangerous power is liable to abuse without limit. And yet, if abused, it is but usurpation, and should share a like fate. Sedg. Const. and Stat. Law, 414. To make it such, let it be granted that I must see plainly and palpably that the tax is for a purpose not public, and still I am prepared to enforce the paramount law which, I think, forbids this legislation.

As already suggested, the Constitution contains no provision prohibiting the legislature from taking private property for *private* purposes, rendering compensation therefor. Yet we all know this cannot be done, and so this court has held. *Bankhead* v. *Brown*, 25 Iowa, 540. And this, upon the principle that the right is among the unenumerated and reserved rights, because all legislation must take cognizance of *original right*, and because such an act would be against the plain and obvious principles of common reason and common right. And, yet, what is the case before us but this? It will not do to say that the public may be benefited by this road, and that the *purpose* is, therefore, *public*. If so, then I affirm that the same might be equally true of a mill, a foundery, a bridge (toll), a church, a public hall (owned and controlled by an individual), a cheese or any other factory. These might not benefit the public as much; but this does not affect the argument. If the object or purpose is public — such as the people may be taxed to support — then the extent of the benefit, or whether it is sufficient to justify the burden, is within legislative, and not judicial, discretion or cognizance. And, yet, why not tax the people to aid and sustain such objects, as legitimately and as constitutionally, as to build a railroad owned by a company, and over

11. —— railroad companies.

which they (the people) have no control; in the selection
of whose officers the State has no voice; where there is
no power, to control its revenues or expenditures; where
all who travel on its road have to pay toll; where such
road may be sold to-morrow, its track torn up and trans-
ported to another locality; where the officers may refuse
to expend another dollar, after the levy voted is expended;
where, in its origin, its management, in its life and in its
death, such corporation is essentially, actually and incon-
testibly private, and not public? There is no parallel
between such a tax and one for school purposes, which is
eminently public, and the expenditure of which the State,
by its officers, controls. Nor is it like a burden assessed
from considerations of honor, gratitude, or charity, as
where the poor are provided for, or those compensated
who enter the public service, or the like. Such cases rest
upon other, and higher, and different grounds.

This opinion has already been extended beyond what
I contemplated. A brief reference to what this court
has heretofore said, and I have done.

In *Clark* v. *The City of Des Moines* (19 Iowa, 199),
it was said: "No instance occurs to us in which it would
be competent for the city to loan its credit for the benefit
of citizens, to enable them to execute a private enter-
prise. * * * We decide that the city cannot loan its
credit, or propose to aid an individual, in constructing a
toll bridge, or any other scheme essentially private. To
prevent municipal corporations from engaging in special
speculative enterprises, it is necessary, * * * as the
current history of these bodies has demonstrated, to keep
the corporate wings clipped down to the legal standard."
And see *Mullarky* v. *Cedar Falls*, id. 21.

In *Chamberlain* v. *The City of Burlington* (id. 395),
discussing the language "*public purpose*," it is said "that
it must relate to, and be connected with, the objects of the

incorporation, and it must be a public purpose; that is, relating to and concerning the public, as contradistinguished from one or more individuals or corporations. The loaning of money to a citizen for the purpose of building a residence would not be a public purpose.  *  * * * Nor would the fact be changed, although the individual borrowing the money should chance to be a corporation instead of a natural person, or that it was used for the establishment of a line of stages or cars instead of a bank or a hall, to be publicly used for the advancement of the private or corporate interests of the borrowers."

I ask, does it make any difference that the tax is levied to be collected and *loaned* for such a purpose, instead of being *given outright* for the same?

All this is plain and well enough understood. There should be but little difficulty in determining what are and what are not legitimate subjects of municipal taxation and superintendence. And there was not, " until cities and counties began to involve their citizens in heavy liabilities, in subscribing in their corporate capacities in railway companies." *B. & M. R. R. Co.* v. *Wapello County, supra.* To call that a *tax*, which, " when collected, goes into the treasury of a private railroad company, is alone controlled and paid out by its officers,  *  *  * is simply a solecism in language." We have thus far (whether the effect shall be fruitless because too long delayed, I do not stop to inquire) interposed the judicial arm to check the attempt of cities and counties to involve their citizens in these heavy liabilities, and I shall not be the first to allow the smaller legal and territorial subdivisions to do that which the larger cannot.

In my opinion, the law is invalid, and the demurrer to the bill should have been overruled.

Hanson v. Vernon.

BECK, J. — I fully concur in the conclusions, and the reasoning supporting them, of Chief Justice DILLON and Mr. Justice WRIGHT, as announced in their respective opinions, and would be content, in ordinary cases, with silen assent thereto. The importance of the principles involved in the case demands special care and patient attention in their consideration. I have endeavored to give them such an examination, and am brought thereby to a most clear and satisfactory conclusion as to the unconstitutionality of the law in question. I will briefly state some of the reasons upon which that conclusion is based.

It cannot be maintained that the Constitution confers upon the State government absolute and unlimited legislative power, authorizing all laws affecting the rights and property of the people, not expressly prohibited by that instrument. The people, in the formation of the Constitution, wisely reserved to themselves all rights unimpaired over which power is not delegated to the State government. Section 25 of the bill of rights provides that the enumeration of rights contained in the Constitution shall not be construed to impair or deny others retained by the people. There is, as it were, back of the written Constitution, an *unwritten Constitution*, if I may use the expression, which guarantees and well protects all the absolute rights of the people. The government can exercise no power to impair or deny them. Many of them may not be enumerated in the Constitution, nor preserved by express provisions thereof, notwithstanding they exist and are possessed by the people, free from governmental interference. The rights of property, and rights arising under the domestic relations of husband and wife, parent and child, &c., may not be preserved by express constitutional provisions, yet they exist in all their perfection, and no legislative enactment impairing them can be sustained.

Vol. XXVII. — 10.

The nature of a constitution and the powers of government are forcibly and well expressed by Edward Bates, counsel in *Hamilton* v. *St. Louis County Court* (15 Mo. 13), in the following words, quoted approvingly by Judge Cooley in his treatise upon Constitutional Limitations, p. 37: " What is a Constitution, and what are its objects? It is easier to tell what it is not, than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power — the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the Constitution was made, it is but the framework of the political government, and necessarily based upon pre-existing condition of laws, rights, habits and modes of thought. There is nothing primitive in it; it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard them against the encroachments of tyranny. A written constitution is in every instance a limitation upon the powers of government in the hands of agents; for there never was written a republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition."

The State has no power over the property of the citizen other than to regulate and secure its enjoyment, except that of taxation and of appropriating it to public uses, upon payment of a just compensation therefor. It is not claimed that the law in question is the exercise of the latter power; it must be sustained, if at all, under

the taxing power. In considering its validity, the first and, in fact, the only question to be determined relates to the nature and object of the assessments therein provided for. Are they taxes? This presents the very point and question of the case.

While the power of the State to tax the people may be unlimited, yet it cannot be claimed that every assessment of money, though it be denominated a tax by the law authorizing it, in fact partakes of that nature. Its object determines its character and nature, and the validity of the law authorizing its levy and collection. The law in question, under the name of taxes, authorizes the collection of money to aid in building railroads. These roads are built by private corporations for private purposes, and the profits thereof inure to the stockholders. The franchises and real and personal estate of these corporations, while held by them, are essentially private property, and are in no sense public. The fact that the construction of the railroads may be a public benefit, and of great advantage to the people, does not deprive them of the character of private property. A manufactory of any kind, a mill or a bank, the property of either an individual or a corporation, may be of like great public benefit and advantage, by increasing the wealth and adding to the convenience and prosperity of the community in which they are located, but they are essentially no more private property and private enterprises than railroads. All depend upon the public for patronage and support; all are of great convenience and pecuniary advantage to the public generally, and all are created and maintained for the purposes of the private gain of those who own them, and all are equally private property. It follows that, if on the plea of public benefit, the legislature can authorize taxation to build railroads, it may do the same for the purpose of building manufactories, and to provide capital for banks.

But the object and purpose of taxation must be public.

I do not understand that a purpose which interests or benefits the public generally is of necessity public in its nature. Society is so constituted that the prosperity of any one of its members is, in a degree, of public interest and benefit. The public are often interested in and benefited by enterprises the most remote. The opening and development of the gold mines of California is a benefit to every community in the whole Union. A line of vessels from New Orleans to Liverpool, whereby the surplus grain of the Mississippi valley could be cheaply and expeditiously carried to a good and certain market, would be a great public benefit to every township in this State. It cannot be claimed that the opening of the gold mines of California, or the building of ships, are such public purposes as would authorize taxation of the people of Iowa therefor.

I confess the difficulty of giving a satisfactory general rule whereby it may be determined what is a public purpose for which taxes may be imposed on the people. It is sufficient for the present to determine that such railroads, as are contemplated by the law in question, do not possess that character. And this cannot be considered an open question in this State. In *Chamberlain* v. *The City of Burlington* (19 Iowa, 402, 403), (Mr. Justice Cole delivering the opinion of the court,) it is ruled that the construction of a railroad, by a railroad corporation, is not a public purpose within the meaning of a statute—the charter of the city—which authorizes the borrowing of money for any public purpose.

The question does not arise, and I have not considered it, whether a railroad or a system of railroads may not be a public purpose in such a sense as to authorize the building thereof by the State, and that taxes therefor may not be collected from all the people of the State as

other revenue.  But that the people along the line of a railroad may be exclusively taxed to aid in its construction, as provided by the law under consideration, is, as I conceive, a very different question.  That law provides for the assessment upon, and coercive collection from, the people of certain amounts of money which are in their nature a gratuity to a private corporation.  Because such assessments are made upon the vote of a majority of the voters of the township, they are not thereby made valid, for the majority certainly cannot be clothed with power, which is not possessed by the State itself, to take from the minority their money or property.

If the plea of public benefit would authorize the assessment of taxes for the purposes of constructing railroads, it does not follow that those contemplated by the law in question can be sustained upon that ground.  The theory is that the people may be taxed because they will be benefited by the railroad built in that way.  If this be so, the taxation must be equal, all benefited being equally taxed.  A railroad, as contemplated by the law, may pass through portions of a township wherein a majority of the voters reside, who may vote the assessment. The minority thus taxed may not be benefited at all, or less benefited than the inhabitants of adjacent townships who refuse to contribute to the road by voting a tax upon themselves.  In such a case the law would not practically impose the burden of taxation upon all equally benefited.  Other instances of taxation without benefits, and benefits without taxation, may be pointed out in the practical operation of the law.

While fully comprehending the delicate duty of declaring a law of the general assembly unconstitutional, and therefore void, and well knowing that this can only be done in the clearest cases, yet, in my opinion, the law in question so palpably and indisputably conflicts with

the Constitution that I am constrained to unite with the majority of the court in holding the law void, and the judgment of the District Court must be

Reversed.

COLE, J. (dissenting).— I do not concur in the conclusion reached by the foregoing opinions, because,

I. I deny that this court possesses any power or right to declare an act of the legislature unconstitutional, except it is in conflict with the *written* Constitution of our State. I think the doctrine, which is very clearly enunciated in the first two, and expressly stated in the last, of the foreging opinions, to wit: that we have an unwritten Constitution upon which courts may plant themselves to overturn and annul an act of the legislature, is unsound, without precedent and dangerous. For myself, I still adhere to and affirm the oft-repeated rule, that a State legislature may exercise all rightful legislative power not denied by the State Constitution ; but the federal legislature can only exercise such powers as are granted by the federal Constitution. In determining the validity of an act of the State legislature, the question is, Has the power to make the enactment, been expressly, or by necessary implication, denied ? and, in the case of a federal enactment, Has the power to make it been expressly, or by necessary implication, granted ? If denied in the one, or not granted in the other, the acts are invalid; otherwise, they are valid.

II. I deny that this court has ever *decided* that the legislature did not possess the power to clothe counties or cities with authority to subscribe for stock, or to aid in the construction of railroads or other works of internal improvement in or through them. It is not necessary or proper (in view of the space already occupied by

this case) for me to review the numerous cases. Up to the case of *Stokes* v. *The County of Scott* (10 Iowa, 166), the legislative power, and that it had been exercised, was uniformly affirmed. In that case, WRIGHT, Ch. J., expressly declined to examine the question of legislative power; STOCKTON, J., declared that there had been at no time any doubt in his mind as to the power; and WOODWARD, J., very clearly affirmed the power. In his opinion in that case, WRIGHT, Ch. J., arranges the points for discussion in their natural order, under three distinct divisions: *First*, did the counties possess the inherent power? *second*, had the legislature clothed them with the power? and, *third*, had the legislature any constitutional authority to clothe the counties with such power? As to the first, he holds, in accord with the current of authorities, that counties do not possess the inherent power. As to the second, he shows by the legislative history, not only that the counties had not been clothed with the power, but that the legislature had twice expressly and by direct action refused so to clothe them — once, by striking from the report of the Code commissioners a clause conferring the power; and again, by voting down, upon reconsideration, a bill for an act giving it. Having thus decided that the legislature had not clothed the counties with the power, it became unnecessary (as stated by him in his opinion) to examine the question of the constitutional authority of the legislature to confer it, and this question is not discussed. The subsequent cases (without referring to them) have held the same doctrine and rested their decisions upon the same grounds. If any thing has been said in any of the opinions in respect to the constitutional authority of the legislature to confer the power, it was but the *dictum* of the judge writing the opinion, and not necessary to the determination of the case. And it is reasonably apparent that no such

HARVARD LAW SCHOOL LIBRARY.

question has been *decided* or so regarded, from the fact
that no such head-note or *syllabus* has ever been set to
any case decided by this court. Some of the cases use
the language that under our Constitution and laws coun-
ties and cities do not possess the power to subscribe stock,
etc. But this is very different from saying that under
the Constitution the legislature has no authority to pass
a law giving the power. There can be no doubt, either
upon principle or authority, that counties, cities or towns
may not subscribe stock to a railroad, except they are
authorized so to do by legislative enactment. Nor can
there be the least possible doubt, in view of the legisla-
tive history on that subject, that no such authority has
ever been given by our legislature, until the act now in
question. Upon these two propositions, the later decis-
ions of this court upon county and city railroad bonds
are rested, and thereon are abundantly supported by the
authorities. In every decision by this court, denying
the validity of county bonds, it has been *held* that the
*legislature had not passed any law authorizing their is-
sue.* If no such law had been passed, why discuss the
constitutional authority of the legislature to pass one?
For whether the authority existed or not was immaterial,
since the legislature had not attempted to exercise it. How,
in view of these facts, our learned chief justice can say
that "this court has held just such a law invalid," is be-
yond my comprehension. Upon any principle of inter-
pretation of judicial opinions, there can be no escape
from the conclusion that the question of *the constitutional
power of the legislature* to clothe the counties, cities or
towns with authority to take stock in railroad corpora-
tions, or levy a tax in aid thereof, has never been *decided*
by this court.

III. No clause of the Constitution of our State is cited
or relied upon as denying to the legislature in express

terms, or, indeed, by necessary implication, the authority to confer the power upon counties, cities or towns, to subscribe stock in, or aid by taxation the construction of, railroads. Nor do the foregoing opinions rest upon, or claim that there is any such clause; they go upon the theory, that the right of private property is paramount . to all legislative authority, and the two clauses of the Constitution referred to, are quoted to strengthen the *argument*, rather than as a basis upon which to rest the conclusion.

These two clauses are substantially, and almost literally, in every State Constitution of this Union; and the question of the power of the legislatures, under the State Constitutions, to confer such authority upon counties, cities and towns has been before the Supreme Courts of at least *twenty-one* other States, *and in every instance the legislative power has been affirmed*. See, among many others, the following cases, viz. : *Sharpless* v. *The Mayor, etc.*, 21 Penn. St. 147; *Commonwealth* v. *Perkins*, 43 id. 410; *The People ex rel.* v. *Mitchell*, 35 N. Y. 551; *Clark* v. *City of Rochester*, 28 id. 605; *Gould* v. *The Town of Venice*, 29 Barb. (N. Y.) 442; *Slack* v. *The City of Maysville*, 13 Ben. Mon. (Ky.) 1; *Maddox* v. *Graham*, 2 Metc. (Ky.) 56; *Nicoll* v. *Mayor, etc.*, 9 Humph. (Tenn.) 252; *Goddin* v. *Crump*, 8 Leigh (Va.) 120; *City of Bridgeport* v. *Housatonic R. R. Co.*, 15 Conn. 475; *Society for Savings* v. *New London*, 29 Conn. 174; *Cincinnati R. R. Co.* v. *Commissioners, etc.*, 1 Ohio St. 77; *State, etc.*, v. *Commissioners*, 12 id. 596; *Shoemaker* v. *Goshen*, 14 id. 569; *Prettyman* v. *Supervisors, etc.*, 19 Ill. 406; *Butler* v. *Dunham et al.*, 27 id. 474; and cases cited; *Gibbons* v. *Mobile, etc.*, *R. R. Co.*, 36 Ala. 410; *Robinson* v. *Bidwell*, 22 Cal. 379; *The Commissioners etc.* v. *Bright*, 18 Ind. 93; *The City of Aurora* v. *West, etc.*, 22 id. 88; *Augusta Bank* v. *Augusta*, 49 Me. 507; *Clark* v. *Janes-*

*ville*, 10 Wis. 136; *Mills* v. *Geason*, 11 Wis. 470; *Caldwell* v. *Justices of Burke*, 4 Jones' Eq. (N. C.) 323; *Powers* v. *The Inf. Ct. of Dougherty Co.*, 23 Ga. 65; *The St. Joe, etc., R. R. Co.* v. *Buchanan Co.*, 39 Mo. 485; *City of St. Louis* v. *Alexander*, 23 id. 483; *Strickland* v. *Miss. R. R. Co.*, 27 Miss. 209–224; *Cotton* v. *Com. of Leon Co.*, 6 Fla. 610; *Police Jury* v. *Succession of McDonough*, 8 La. Ann. 341; *San Antonio* v. *Jones*, 28 Tex. 19.

It has also been repeatedly affirmed by the Supreme Court of the United States, certainly in more than twenty cases. See *Gilman* v. *Sheboygan*, 2 Black. 510, and cases cited. And Judge Redfield, in his treatise on the Law of Railways, says: "It has been considered that a railway is so far in the nature of an improved highway, that the legislature may empower towns and counties to subscribe for stock in such companies whose roads pass through such towns or counties, and even where they tend to increase the business of roads which do pass through any portion of the territory of such towns or counties." * * * " The decisions in the several States seem all to have been in favor of the power of the legislature to build railways, at the public expense, of which there is, perhaps, no great question; for it seems to be a species of internal improvement, or intercommunication, which is, in a measure, *indispensable to public interests and public functions* in many ways. * * * It seems to us that, if these public works require public patronage, it would more appropriately come from the State than from the municipalities, which are created for limited purposes, and with no appropriate facilities for the management of pecuniary investments in such extended enterprises. *But the weight of authority is all in one direction, and it is now too late to bring the matter into serious debate.*" 2 Redfield on Railways, 396, § 230

and note. (3d. ed.) So much then for the authorities, which, as stated by Judge Redfield, *are all one way;* and number near two hundred cases; the majority opinions in this case are in the face of, and contrary to, all of them.

IV. The first clause of our State Constitution, quoted to give strength to the argument of the majority, is section 9 of the bill of rights: "No person shall be deprived of life, liberty or property without due process of law." Now, it is as clear upon principle, as it is well settled by the authorities, that this clause of our Constitution, which is common to every State in the Union, has no reference whatever to the *taxing power;* nor has the term, "due process of law," any bearing or limitation upon that power. This is clear. For, if the taking of property by taxation, is the taking of it "without due process of law," then this clause inhibits the legislature from all taxation, and it would be powerless to authorize by law, directly, the levy and collection of any tax. The argument of the Chief Justice, derived from this section, then, is too strong and proves too much; for if, under it, the act in question is unconstitutional, then every revenue law upon our statute book is unconstitutional also; since every tax law now in force provides for the collection of taxes without any process of law, that is, judicial process. The next clause quoted is section 18 of the bill of rights: "Private property shall not be taken for public use without just compensation being first made, or secured to be made, to the owner thereof." * * * But this section, which is also substantially the same in every State, as has been repeatedly held, and as is clear from its very terms, is not a limitation on the taxing power, but on the right of eminent domain. See *Gilman* v. *Sheboygan*, (2 Black. 510, and cases cited). If this clause did apply to the taxing power, it would be fatal to its exercise in

every instance. For, if just compensation to the owner must be made before his property can be taken for *taxes* for the *public use*, then the public treasury would be drained to make compensation just as fast as it would be replenished by the taxes, and no revenue could possibly be derived by taxation. There can be no question, then, it seems to me, that neither of these sections apply to the case under consideration, and hence they do not and cannot afford any strength to the argument made by the Chief Justice.

But the majority opinions are *grounded* upon what *is not in the Constitution*, but which is supposed to have an existence somewhere, and to be referred to in the last section of the bill of rights by the words " this enumeration of rights shall not be construed to impair or deny others retained by the people." For myself, I think that this section of the Constitution does not provide or establish any additional or further limitation upon the legislative power. And, indeed, I think that if this section had been omitted entirely from the Constitution the fact it declares would have had just as potential an existence as it now has. In other words, that by a uniform rule of interpreting constitutions, they are construed as not denying or impairing rights retained by the people other than those enumerated in them.

But I deny, most confidently, that, under this provision, whether expressed or implied, courts of law may rightfully declare an act of the legislature unconstitutional and void, as being in conflict with it. To so hold, is to place the legislative department at the feet of the judicial, and to render the immediate representatives of the people powerless to protect them in their rights, or from the encroachments of judicial power. If the views of the majority are sound, then it is certainly true, that our Constitution does not define the pow-

ers of the respective departments of our government, but leaves them to the necessarily uncertain, and ever-changing measurement of *judicial discretion.* And this, I think, fairly illustrates the two fundamental errors of the majority: First, in supposing that there is an un-written Constitution by which courts may measure the legislative power; and second, in supposing that the courts are the only protectors, though not in any just sense the representatives, of the people; that the people must look to the courts and not to the legislature to re-lieve them from actual or supposed unwise legislation. It is well settled that a statute cannot be declared void on the ground of its violating fundamental principles of republican government, when it does not come in con-flict with written constitutional provisions. *People* v. *Mahony,* 13 Mich. 481; *People* v. *Gallagher,* 4 id. 244.

V. Taxation is an attribute of sovereignty, which is, under our form of government, intrusted exclusively to the legislature; and as was said by Chief Justice MARSHALL, in the case of *Brown* v. *McCulloch,* 4 Wheat. 428: "The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation. The people of a State, therefore, give to their government a right of taxing themselves and their property; and as the exigencies of the government cannot be limited, they prescribe no limits to the exer-cise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative to guard them against its abuse." And again, the same pre-eminent judge said, in *Provi-dence Bank* v. *Billings,* 4 Peters, 51: "This vital power may be abused; but the interest, wisdom and justice of the representative body, and its relation with its constit-

uents, furnish the only security against unjust and excessive taxation, as well as against unwise taxation."

The legislature, being thus intrusted with the unlimited power of taxation, which, it may be conceded, is only rightfully or wisely to be exercised for public purposes, is necessarily made the sole and final judge of the fact whether the purpose is *public* or not; and the courts cannot, without arrogating to themselves powers with which they are not constitutionally intrusted (as I think), undertake to overrule the legislature and declare that the purpose is not public. If the courts may do this, even in a doubtful case, then they may do it in every case, and thereby become the ultimate judge, thus assuming a power which by the Constitution has been confided alone to the legislature.

But, if it should be conceded, as is claimed by some text writers and countenanced by some courts, that, if the legislature should enact the raising of a sum of money by taxation, for a purpose whereby no possible public benefit, direct or indirect, could be derived therefrom, then the courts might interfere to declare the law invalid, still this is not such a case. And it was said by the Supreme Court of Wisconsin, in *Brodhead* v. *The City of Milwaukie*, 19 Wis. 652, that: "To justify the court in arresting the proceedings, and in declaring the tax void, *the absence of all possible public interest* in the purposes for which the funds are raised *must be clear and palpable;* so clear and palpable as to be *perceptible by every mind at the first blush.*" This is the extent of the doctrine as it is claimed by those text writers and courts who assert the ultimate judicial authority to revise and set aside the legislative action, upon a *subject matter* within its unquestioned constitutional authority.

The question then is, whether there is a total "absence of all possible public interest in the purposes for which"

Hanson v. Vernon.

the act in controversy authorizes the tax to be levied? The majority mistake the real question in the case; and the chief justice, in his labyrinthian argument, makes his exit at the precise point of entrance without having reached the very point in contest. He supposes that the railroad company is a private corporation, and, since the proceeds of the tax are to be ultimately received by such corporation, that the *use* must, therefore, be *private*. The distinction between a *private corporation* and a *public use* does not seem to have been apprehended by the majority. It seems to be claimed, that because the money raised by the tax is finally to come to the coffers of a private corporation, the tax is, therefore, not for a public use. But this argument would nullify every tax law, since it is true, I presume, that every dollar raised by taxation does also finally come to the coffers of private corporations, or the purses of private individuals, in payment of claims they hold upon the treasury for the *public use* they have severally served.

Let us look at this argument a little more closely. Private property can only be taken for *public use*, and then only upon compensation being paid, or secured. (Cont. art 1, § 18.) But property, to wit: real estate of the citizen, may be taken at the instance of a railroad company, a private corporation if you please, for its use, either for right of way, depot grounds, wood and water stations, or the like. No court or judge has been bold enough to deny, or even question, this latter proposition. How is it taken then for a *public use* when it is taken, as my Brother Dillon says, for the use of a *private corporation?* The answer is plain, though the majority cannot see it. The *public use* is most economically and efficiently accomplished and enjoyed through the instrumentality of a corporation. But, the *use* is none the less *public* because it is secured and effectuated by the aid of

a *private* corporation. But I deny that, in common parlance, a railroad corporation is a "private corporation;" although I admit that in technical legal definitions or classifications they are called "private corporations," as distinguished from counties, cities, towns, etc., which are called "public corporations." See as to this, opinion of SMITH, C. J., in *Barren* v. *Beatty*, 34 Miss. Rep. 227.

What answer, then, does or can the majority give to the question, by what constitutional right does a "private" railroad corporation take the very homestead ground of a citizen, turning him and his wife and children out of doors, houseless and homeless, in order to make a way or depot ground for itself? They have already said that if the railroad company takes five cents from the citizen, under the law in question, and applies it to the construction of its road, such taking is unconstitutional, because it is the taking of private property and applying it to the use of a private corporation. But we have already seen, by the very letter of the Constitution, that it could not take the citizen's homestead or real estate for *private purposes* or use, and that only because it is for a *public use* can it be taken, and let it be remembered that when a railroad corporation takes the citizen's real estate, for a way or a depot, the title vests in a "private corporation," and is controlled by it and for its own advantage and profit; and further that it is used and controlled by the same corporation, in the same way and for the same purpose as it is proposed the five cents tax, under the law in question, shall be used and controlled, and yet, strange as it may seem, the majority are driven by their peculiar views to *hold* that the land or homestead is taken for a *public use*, and the five cents for a *private use*, although both are put to *precisely the same use.* To take the homestead is constitutional, valid and to be encouraged; but to take the five cents is unconstitutional, invalid and an unwar-

ranted invasion of private rights.    And in this connection it should be also remembered that compensation for property taken for public use is always to be made under our Constitution, because the Constitution requires it. But for this requirement the right of eminent domain could be exercised without making compensation.

Reference is made in the majority opinions to the unfortunate conflict now existing between this court and the federal Supreme Court upon the question of the validity of county and city bonds; and I confess that I cannot free myself from the conviction that this conflict has a controling influence upon the majority in their opinions.    This court has *held*, in its later and unanimous opinions, that counties and cities, under the laws of this State, do not possess the inherent power to subscribe stock in railroad corporations and tax the people for the payment thereof, and that no law had been enacted in this State authorizing them so to do.    Upon this latter proposition, and in view of the earlier and contrary decisions upon the question, the conflict has arisen.    Now I have no doubt whatever that an enlightened public sentiment *will*, as does the unbiassed legal judgment of the country *now*, fully sustain and vindicate our court.

But if our court shall deny the power of the cities and counties to take stock and levy a tax to pay the same, now that a law has been passed authorizing them so to do, and rest its decision, as the majority does, upon a principle of construction which has been distinctly and directly denied and repudiated by the Supreme Court of every State in the Union before which the question has been presented, as well as by the Supreme Court of the United States, it will, to a certain extent, deprive us of the moral power and respect we are entitled to receive, upon the question in conflict wherein we are so clearly in the right.    For myself, I cannot allow my antagonism

to a great wrong, even, sought to be visited upon the people of my State, to drive me to a hostility to the right, although the agent executing the wrong may agree thereto.

Doubtless the law in question might have been more skillfully drawn and carefully guarded; but it is not in the power of courts to set aside, as null, every unskillfully drawn or unguarded statute. The clear purpose of the statute is to allow the people of the several municipalities, at their own pleasure, to tax themselves, not exceeding five per cent, for the purpose of constructing a public improvement, a railroad, which has ever proved, where constructed, of great advantage to individuals and the community in proximity to it. I think the law is valid, and whether it is wise or unwise is not a matter for our determination. I entertain no doubt that the judgment should be affirmed, but the majority say it must be

Reversed.