## IS THE BUILDING OF A PUBLIC HALL FOR AUDITORIUM AND EXPOSITION PURPOSES WITHIN THE POWER OF A MUNICIPALITY.

Common Pleas Court of Cuyahoga County.

J. C. HEALD v. CITY OF CLEVELAND, AND HARRY L. DAVIS, MAYOR OF THE CITY OF CLEVELAND.

Decided, December 14, 1916.

*Municipal Corporations—Authority to Acquire Land and Build a Public Hall for Auditorium and Exposition Purposes—After an Issue of Bonds Therefor Has Been Approved by Referendum Vote—Action by City Through its Director of Law to Enjoin the Issue—Application by a Tax-payer to Intervene—Function of Municipal Government—Limitations on the Power of Taxation—Judicial Constructions of the Words "Public Purpose"—Is a Convention Hall a Public Utility—Determination as to the Plan, Design, Location and Character of Such a Hall Not an Administrative Function—Has a Municipality Authority to Collect Rents for Use of a Hall —An Action by the Director of Law is an Action in Behalf of Every Tax-payer of the City.*

1. A resolution by a city council, declaring the necessity of issuing bonds in excess of the permissible amount for the erection of a public hall for auditorium and exposition purposes and acquiring the land necessary therefor, is not an emergency resolution within the provisions of the state Constitution and the charter of the city of Cleveland.

2. The city of Cleveland has authority to build a hall for auditorium purposes and to issue bonds therefor, and may use such auditorium for any lawful purpose and derive revenue from such use; but said city has no authority to issue bonds to be used primarily for a building for exposition purposes, or to use portions of its auditorium for lodge rooms, concert halls, show rooms, or theaters, as a purely private enterprise.

3. An action brought in good faith by the director of law in the common pleas court, having the same parties and interests identical with those of the present action and determined after a full hearing on the merits and the judgment thereafter affirmed by the court of appeals, the issues whereof were the same as in the present suit or could have been properly presented, renders the ques-

tions so determined *res judiciata;* but the question of the right of the mayor of the city to cause to be constructed in said auditorium rooms for shows, concerts, lodge purposes, etc., for the purpose of deriving revenue by leasing such rooms ,to pivate persons, was not put in issue in the former suit and the determination in that action is therefore not *res judicata.*

4. In the absence of any action by the city council as to the plan or design of the proposed auditorium building, allegations of the petition as to its contemplated use are anticipatory, speculative and premature, and are not before the court for adjudication.

5. In designing the proposed auditorium the city may lawfully provide rooms other than the auditorium for purely civic and municipal purposes; and when such rooms are not needed for such purposes, the city may derive revenue therefrom by lease or otherwise.

*John C. Heald,* for plaintiff.
*City Solicitor,* contra.

FORAN, J.

On the 28th day of February, 1916, the city council of the city of Cleveland duly and regularly passed a resolution declaring the necessity of issuing bonds of the city in excess of an aggregate of $2\frac{1}{2}\%$ of its tax duplicate of 1916, for the erection of a public hall for auditorium and exposition purposes and acquiring the land necessary therefor, in the sum of $2,500,000, the resolution providing that the question of issuing and selling the said bonds be submitted to a vote of the qualified electors of the city at a special election to be held on the 25th day of April, 1916, of which special election the mayor was directed to give the usual and legally required public notice. The council also declared the resolution to be an emergency. On the first day of March, 1916, John C. Heald, a resident and tax-payer of the city of Cleveland, requested in writing W. S. FitzGerald, the director of law of said city, to institute proceedings in the Court of Common Pleas of Cuyahoga County, Ohio, against the said city and Harry L. Davis, its mayor, and the members of the board of deputy state supervisors and inspectors of elections, enjoining the said mayor from issuing the proclamation for said special election and en-

joining the members of said board of elections from making arrangements for holding said election, for the reason that the contemplated expenditure of money for the erection of said building is not authorized by law, and that the resolution of the city council providing therefor is illegal and void. In compliance with this request, the director of law, on the 8th day of March, 1916, filed in this court a petition, being cause No. 148,-749, on behalf of the city of Cleveland and against all the parties, except the city, named in the request, and for the purposes therein named and contemplated. On March 9th, 1916, waiver of issue and service of process and entry of appearance was filed by defendant, Mr. Ben. C. Wickham appearing for the mayor, and Mr. A. A. Cartwright appearing for the members of the board of elections. Both of these gentlemen are assistants to the director in the department of law.

On March 11, 1916, John C. Heald, as a resident tax-payer, filed an affidavit in said case in support of a request to intervene by petition and become a party to the action. The intervening petition tendered by Mr. Heald is substantially such a petition as Mr. Heald would have filed if the director of law had not acceded to his written request of March 1, 1916; nor does it differ materially from the petition filed by the director of law.

The application to intervene was refused by the court, and we think properly so, as his right to file such petition depended solely upon the refusal of the director of law to bring the contemplated action.

March 15, 1916, Mr. Heald, in writing, requested the director of law to amend the petition filed by him in certain respects, which request was complied with to the entire satisfaction of Mr. Heald, who was also accorded the courtesy of appearing in the case as attorney and taking part in the argument.

On March 31, 1916, the defendants, by their respective attorneys, filed a demurrer challenging the sufficiency of the facts stated in the amended petition to constitute a cause of action against them. This demurrer was overruled *pro forma* by the court of common pleas, to which ruling exception was duly

taken, and petition in error filed in the court of appeals April 5, 1916. The cause was presented to the court of appeals April 12, 1916, the city of Cleveland being practically represented by Mr. Heald, though he does not appear as attorney of record.

On April 22, 1916, the court of appeals sustained the ruling of the court of common pleas, and thereafter the director of law refused a request by Mr. Heald to apply to the Supreme Court for certification of record to that court, on the ground that the election having been held on April 25, 1916, there was nothing left in the case for the Supreme Court to review.

Thereafter on May 18, 1916, the proceeding now before the court was instituted by Mr. Heald, and on September 30, 1916, an amended petition was filed.

The plaintiff, John C. Heald, as a resident tax-payer of the city of Cleveland, brings the action, being cause No. 149,848, against the defendants, the city of Cleveland and Harry L. Davis, mayor of said city. The petition is in all essential respects substantially the same as the amended petition in cause 148,749, instituted by the director of law at the written request of the plaintiff herein, except that it contains averments which may be termed a second cause of action, the substance of these additional averments being that the city of Cleveland is at this time facing a deficit in operating and maintenance expenses of over three and one-half million dollars, and that during the year 1917 the defendant city may be required to, and of necessity must, expend this amount of money in excess of the maximum amount it will derive from all available sources of revenue to efficiently maintain the usual activities and running expenses of the municipality; and further, that there is no provision of law whereby this deficit can be provided for, met or discharged, and that therefore and by reason thereof the defendant city is financially unable to construct, operate and maintain the proposed auditorium and at the same time efficiently discharge its functions of government as required by law.

The prayer of the petition is, that the defendant, Harry L. Davis, as mayor, be enjoined from disposing of or selling the

bonds voted for at the special election of April 25, 1916, under the resolution of the council of February 28, 1916, and from delivering to the sinking fund commission any part or portion of said bonds.

The court is further asked to determine and find "that the contemplated erection of said building is beyond the scope and power of the municipal corporation of the city of Cleveland."

The joint answer of the defendants contains two defenses: first, a general denial, save and except as limited by certain admissions; and second, a plea of *res judicata*, that the averments and matters in the petition, traversed by the general denial, were litigated and adjudicated in cause 148,749, being the proceeding instituted by the director of law at the instance and request of plaintiff herein.

With respect to the allegations in the second cause of action, the record discloses the city of Cleveland, under the so-called Longworth act and related and amendatory acts, may, by vote of the electors, contract and incur additional indebtedness aggregating nearly seventeen million dollars on the basis of the tax duplicate of 1916.

It is true that the city of Cleveland, in common with all the large cities of Ohio, is so financially embarrassed at this time that, unless relief is afforded by the Legislature, its credit will be seriously impaired. Under such circumstances it may not be wise to incur large additional obligations for the promotion of civic enterprises of questionable legality and doubtful expediency. But this is wholly a question of administrative policy, unless it clearly appear that the legal line is to be crossed; and the trend of recent authority seems to be that home rule charters and laws for the promotion of municipal local self-government are to be liberally construed; and where doubt exists it will be resolved in favor of the municipality. Cities in the United States are comparatively young. To build a new city along modern lines and with all modern conveniencies for safety and comfort is exceedingly expensive, and it is not unjust or unfair that future generations be required to bear a portion of the bur-

den, as they will certainly reap many of the benefits.   Obviously, however, there is a limit beyond which disaster looms and casts a menacing shadow, for the loss of credit prestige is not compensated by the dubious consolation of knowing that if we can not pay we will soon be in a position where we can not owe. But as has been said, this is a question of policy or of morals, and not of law; and the allegations of the petition relating to the financial condition of the city will be eliminated from further consideration.   In any event we are not disposed to cavil at municipal bond indebtedness created for the purpose of making necessary improvements.

All economists, social as well as political, seem to agree that where public moneys are honestly and judiciously expended for proper municipal purposes, taxation for such purposes measures the state and condition of civilization and social progress found in such municipality.

By the prayer of the petition the court is asked to determine and hold that the contemplated erection of a public hall for the city of Cleveland, for auditorium and exposition purposes, is beyond its scope and power.   A few general observations may throw some light upon a question involved in doubts. and uncertainties that courts seem unable to wholly dissipate in clear and unmistakable terms.   This perhaps grows out of complex difficulties inherent in social conditions and activities.   Municipalities, as we now find them, are at one and the same time decentralized portions of general government and corporation organizations of property owners for the administration of private property.   While these are found submerged in the general function of municipal government, the distinction should not be lost sight of.   The modern tendency is to enlarge the scope of the first part of this proposition and to ignore the latter. The enactment and enforcement of ordinances for the preservation of public peace, public health and public morals is a state function which may be performed by a local government by virtue of grants of power from the Legislature or the state, and perhaps inherently by the exercise of police power, which we

think is extended to municipalities by the home rule amendment to the Constitution. The enactment of an ordinance for paving and improving a street is primarily a mere instrument to make and enforce a contract between property owners for mutual convenience and benefit in the using of the street. In times not very remote the expense of improving and lighting streets was borne by the property owners without calling upon the local government to perform that function for them. As cities grew and expanded, the confusion resulting from such mode of improvement had to be obviated by centralizing the power in the local government; but the principle remains, and some consideration is still due owners of property on streets where improvements are made.

A municipality is, then, a subordinate branch of the state government exercising, according to our theory of the decentralization of power, at a certain locality the functions of state government. In other words, it is one of the creatures of the state to exercise, within a limited sphere, the functions and powers of the state. *U. S.* v. *R. R. Co.,* 17 Wall., 329; *New Orleans* v. *Clark,* 95 U. S., 653.

Before the constitutional amendments of September, 1912, municipal corporations in Ohio, under the Constitution of 1851, were created and governed by general acts of incorporation. They had no inherent power to pass ordinances or enact laws. They had no power in this respect except such powers as were expressly and clearly conferred or granted by the state or which necessarily may be implied by clear intendment in order to carry into effect the powers expressly granted. In this respect the distinction between constitutional and statutory provision obtains. A constitution is the basic foundation or organic law of the state in which rests the supreme power so far as delegated by the people in their sovereign capacity. A statute is the written will of the governing body of the Legislature created by the Constitution. This governing body can not exceed the powers granted to it by the Constitution. Any power not expressly granted or fairly and necessarily implied to carry

into effect the powers expressly granted is retained. Munici-
pal corporations are agencies or municipalities to which the
Legislature delegates a portion of the governmental powers
vested in it in order to meet local conditions and wants pertain-
ing to populous communities for which the Legislature makes
only general provision. Any power not so expressly delegated
or which may be necessarily implied to carry into effect the
powers so expressly granted is retained by the state.

The absolute right of the Legislature to interfere at will and
change the mode of government of any particular municipality
was limited by constitutional restrictions; but the restrictions,
before September, 1912, were often openly evaded for purely
political reasons; and boss rule, made possible by ripper legis-
lation, became a menace to property, peace and social order.
The strenuous and insistent demand for relief found expression
in the home rule amendment of September, 1912, which gives to
municipalities ''all powers of local self-government * * *
not in conflict with general laws'' (Section 3, Article XVIII),
and this must be taken to mean that any power or authority the
state can properly confer upon a city operating under a local
self-government charter, that power or authority the city may
itself exercise, provided it be not in conflict with general laws.
The home rule amendment ''parcels out a definite branch of
*paramount* sovereignty of the commonwealth to certain terri-
torial subdivisions of the state.'' Wilkin, J., in *State, ex rel,* v.
*Lynch,* 88 O. S., 101. ''Since municipalities get their powers
from the state, it is mathematically certain they can include no
power not possessed by the state. Local self-government is
necessarily a part of government less than the whole.'' Shauck,
J., *State, ex rel,* v. *Lynch, supra.* In this case Justice Shauck
delivered the opinion of the court, and it quite clearly appears
from the language just quoted that for all local purposes a city,
under the home rule charter, may exercise paramount sover-
eignty. It can not, as Shauck, J., points out, exercise powers
not possessed by the state; but here there is a clear admission
that it may exercise for local purposes any power possessed by

the state. And this construction has been given to all freeholder charters in states whose constitutions provide therefor. A city government is a part of state government, but in that part and for purposes legitimately pertaining thereto it has *ex necessitate* paramount sovereignty. See 81 Minn., 79; 106 Minn., 94.

Speaking of. the opportunities which may be presented and offered for the expenditure of public money in cities governed by home rule charters, and the necessity for limiting and curbing extravagence, Shauck, J., said, page 95, *State, ex rel,* v. *Lynch, supra*: "Obviously there are far-reaching laws which can not be anulled by statutes or constitutional amendments." This is a broad assertion, for it in fact means that the people, in their sovereign capacity, are above the Constitution and above laws; and that there are certain well defined sociological principles which can not be ignored without involving the state in common ruin.

What are these laws of which Justice Shauck speaks? They are social and economical, the law of competitive forces, the law of individualism, of *laissez faire,* the law of supply and demand, and among others including the law of diminishing returns and the law of compensation. The laws of competition are as immutable as the laws of matter. Every individual has an indefeasible right to use his powers and faculties or forces as he may deem best, not inconsistent with the general welfare, the test being, to what extent can each citizen be permitted to have freedom of action without injury to all the rest? In the social order we find three clashing, warring instincts or forces, individual egoism, social affection (altruism) and state ambition. If man is to progress and social order survive, it is supremely essential that no one of these forces shall destroy the other. It is a lesson of history that at intervals there appear misguided, discontented spirits, often benign and sociolistic, who dream "of a fixation of relative values by governmental regulation." Their activities are often justifiable, for competition is at times fierce and cruel; but they fail to recognize that it is a

law of life which can not be destroyed without a social debacle destructive of law and order. The desire of man to achieve is the motive power of the social world. Its suppression means social inactivity, stasis and death. Mind is the supreme law of human destiny; and to mind left entirely free to act along competitive lines may be traced the progressive development of humanity. That order is best, then, where there is harmonious co-operation between the instincts of egoism, social affection and state ambition. As the individual is the raw material from which society is created, the least restraint placed upon his activities the better for the general welfare. Whatever belongs exclusively to the domain of individual effort should be left free, and government should only occupy itself with those necessary things and activities beyond the power of the individual to achieve and which he can not obtain without its aid. Ignoring immutable laws, many legislative and social schemes have been tried for the alleviation of poverty by seeking to divert or override these laws. But we should not forget that the social highway is littered with the blasted hopes of these human aberrations. While charity is a moral duty and a sacred virtue to be sedulously encouraged and fostered, charity is certainly not a legal obligation.

If it is conceded that the people should be given free music and free lectures on art, because the tendency of these things is toward higher idealities, hence better civilization, where will the line of demarkation be drawn? Surely, to properly feed and house a people will promote health, peace and contentment. Shall food, raiment and shelter be provided free to all who demand them? This may seem an extreme view, but there is a growing tendency to demand state assistance observable everywhere. This tendency, unless checked, will inevitably lead to a demand for "that system which would have economic relations regulated as far as possible by the state, and which would substitute state help for self help." Obviously this means state socialism, which, if carried to its logical sequence, would seek to establish a world of utopian fancy for a world of reality, a

dream world, in which the individual is to be absorbed and swallowed by a collective being and become a mere cipher, a mere cog or pulley in the social machinery.

The object of society should be to give value to the individual. If he is sacrificed to society, he becomes a mere cipher and dependent, without initiative or ambition, wholly useless unless as he may be used by a power superior to himself. We should not forget that the value of society is measured by the value of those who compose it. In a society left free to follow the laws of its nature, there is, as there is in the individual, an instinct of progress as well as an instinct of preservation. These instincts are generally at war with each other, but both are essentially necessary to human development, and the destruction of one involves a destruction of the other, which simply means that while the individual should not be sacrificed to society, neither should society be immolated to the individual. Order and progress we must encourage, foster and promote, but, on the other hand, we must avoid the world of magic fancy, the maze of altruistic speculation more confusing than the labyrinth of Amenemhat, the uselessness of which invited destruction by practical forces and the gnawing teeth of time.

This leads us to the question of government, its functions, powers and limitations. Is the erection of a public hall for auditorium and exposition purposes by the city of Cleveland a function of government? If so, it will be admitted by all who have given the subject attention that the government function has been pushed to the extreme limit beyond which there is peril and danger. Whatever may be said of government, this must be admitted: it has never possessed sovereign power completely. An inherent power remains in the people which imposes on government impassable limits. In its widest sense, a government is the ruling power in a state, or the political subdivision of a state. The legislative and judicial departments are fairly well defined. The administrative department is more difficult of definition, though it may be said to include all state activity not included in the other two departments; but the limits of this

state action are difficult to define. Still more difficult of definition is the answer to the question, what should the state do for the citizen, and to what extent may the state interfere with the activities of the citizen?

It may be assumed that the consensus of opinion, based upon the experience of mankind, is a general presumption against state interference, except the necessity therefor be real and great. The powers of the state are already so dominant that individual freedom and personal liberty are constantly in danger. In the nature of things there must be some assignable limits to the power of the state. We have already intimated that this limit is passed when the state seeks to do for the individual that which he can voluntarily do himself. The *laissez faire* maxim—let alone, or do not govern too much—is a good one to follow and keep in mind. Hence the state should not engage in private enterprises or competitive activities. Whereever and whenever government has sought to direct the activities of the citizen, the result was disastrous. "It is an eternal experience that every man who has power is inclined to abuse it." (Montesquieu.) There are two schools of thought on this subject, those who seek to curtail and those who seek to enlarge governmental activity or power. Between the two there is a common middle course upon which all should agree. There are many careful and thoughtful jurists who incline to the belief that the primary duty of government is to protect, that is, to maintain the rights of its citizens to life, liberty and property. This is the basic idea of the Declaration of Independence.

In *U. S.* v. *Cruikshank et al*, 92 U. S., 542, Chief Justice Waite said, page 549:

"Citizens are members of the political community to which they belong. They are the people who compose the community, and who, in their associated capacity, have established or submitted themselves to the dominion of a government for the promotion of the general welfare and the protection of their individual as well as their collective rights. In the formation of a government, the people may confer upon it such powers as they choose. The government, when so formed, may, when called

upon, exercise all the powers it has for the protection of the rights of its citizens and the people within its jurisdiction; but it can exercise no other. The duty of a government to afford protection is limited always by the power it possesses for that purpose.''

By what stretch of the imagination can it be said that affording a community free opportunity to hear music and lectures is a paramount exercise of governmental power? If the governmental function is limited to the protection of the citizen, and it can exercise no other power, that limit will be exceeded if some of the things set forth in the plaintiff's petition are to be performed under the resolution of February 28, 1916. But as we shall undertake presently to show, we think this is largely a matter of surmise and speculation upon the part of the plaintiff.

The greatest power exercised by government is the power to tax. This power is not only an incident to government, it is indispensable to its existence. However, ''the power to tax involves the power to destroy.'' *McCullough* v. *Maryland,* 4 Wheat., 316. This language was used by Chief Justice Marshall; and the same eminent jurist, in *Weston* v. *City of Charleston,* 2 Pet., 449, said:

''That if the right to impose tax exists, it is a right which in its nature acknowledges no limits. It may be carried to any extent, within the jurisdiction of the state or corporation which imposes it, which the law of each state and corporation may prescribe.''

''There is nothing poetical about tax laws. When they find property, they claim a contribution for its protection.'' *Tinley* v. *State,* 22 Pa., 381.

These considerations pointedly suggest the necessity of limiting this tremendous power; and by Section 13 of Article XVIII of the Constitution the state has reserved the right to limit the power of its cities to levy taxes and incur debts for local purposes.

It must be conceded that public moneys should only be used for a public purpose. "No authority, or even dictum, can be found which asserts that there can be any legitimate taxation when the money to be raised does not go into the public treasury, or is not destined for the use of the government or some of the governmental divisions of the state." 27 Iowa, 28.

That legitimate taxation should be limited to public purposes is axiomatic. The very meaning of the term excludes the claim that the public revenues can be used for private objects or purposes. This is important, as, by what may be called the diffusion of taxes, every human being who is a consumer of the products of labor is a tax-payer; and ultimately the great consumer, and not necessarily the large property owner, is the great tax-payer. The laws which regulate the distribution of wealth are beyond the sphere of government; but the state has power to equalize the burdens of society among its members in proportion to their wealth. While consumers may regulate the amount of taxes they pay, owners of what is sometimes called non-taxable wealth should not be permitted to do so. Beyond cavil there can be no lawful tax which is not laid for a public purpose. It may not always be easy to decide what is a public purpose. It is sometimes said, and it is claimed by counsel for defendant in this case, that a public hall for auditorium and exposition purposes will be a benefit to the public, in that it will be the means of drawing to the city great crowds of people from other sections of the country who will expend money among our citizens. But as Justice Miller said in *Loan Association* v. *Topeka,* 87 U. S., 655: "The same may be said of any other business or pursuit which employs capital or labor." That said grants of power to municipal corporations must be strictly construed, and that funds raised or provided by them, especially by a vote of the electors, for a specific purpose named in the resolution or ordinance, can not be diverted and used for an entirely different purpose, is fundamental and need not be discussed. That taxes can only be used for a public purpose is also elementary. But there is a wide latitude of judicial opinion as to what consti-

tutes a public purpose. There is general unanimity, however, that moneys can not be lawfully used to promote private enterprises. And this is especially true if these enterprises are to come into direct competition with others of a similar character, such as are usually managed, owned and controlled by private persons. Practically all the authorities cited by plaintiff to support the contention that the purpose of the defendant city is *ultra vires,* fully sustain these general propositions; but the question still remains, is the erection of a building for auditorium and exposition purposes a municipal affair or a proper function of municipal government?

Section 3, Article I of the Constitution provides, among other things, that the "people have the right to assemble together in a peaceable manner to consult for their common good." This is in the main an affirmance of the principle guaranteed by the Federal Constitution.

It will no doubt be claimed that these constitutional provisions simply provide that the right of the people to peaceably assemble for the purposes stipulated shall not be infringed upon or interfered with by the state, and this is the extent of the right. This contention is too narrow, and loses sight of the fact that the right to assemble involves a duty. The right of suffrage involves the duties of citizenship; and when these duties are not exercised, the liberty, person and property of the citizen is endangered.

In *U. S.* v. *Cruikshank,* 92 O. S., *supra,* it is said in the fifth syllabus that:

"The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or *for anything else connected with the powers or duties of the national government,* is an attribute of national citizenship, * * *. The very idea of a government republican in form implies that right."

If the right to assemble is an attribute of national citizenship, or a characteristic and distinguishing mark of citizenship, then it should be exercised, and hence Chief Justice Waite held that

it was not only the right but the duty of a recently enfranchised race to assemble for all lawful purposes pertaining to the welfare of the race. The right to assemble involves the power and the ability to assemble and provide the necessary facilities therefor. We have long since passed the town meeting period of our history. In the winter season, in most portions of the United States, the people can not assemble in an auditorium that has only the sky for a roof. It may be said they can rent a suitable hall for such purpose, but why should a dozen or two public spirited citizens be required to bear a burden pertaining to one hundred thousand citizens? The majority of our citizens can only be aroused by an earthquake shock and menace. When a public duty is urgent, there is always a Thomas who is willing that George shall assume the performance of the duty, Thomas knowing that the benefit will inure to him without effort. Man is so extremely selfish and hedonistic that he frequently forgets that eternal vigilance is the price of liberty.

In *Denver* v. *Hallett*, 34 Col., 393, the court practically held that, even admitting an auditorium is not essential to the declared objects and purposes of a municipality, still the constitutional provision providing for municipal home rule so enlarged the powers usually granted by the Legislature that the power to provide such auditorium could be exercised by the city of Denver; in other words there was an inherent power in the city which could be invoked by reason of the home rule provisions of the Constitution. This power innately existing as a necessary element of municipal government, must have its basis in some quality or attribute characterizing all rights growing out of social necessity and fundamental to the preservation of individual protection and liberty, which the right to assemble strongly tends to conserve.

Counsel for the defendant cites *State, ex rel,* v. *Barnes,* 22 Oklahoma, 191, as being *in pare passu.* The citation is not felicitous. It was there held that the city of Guthrie could build a convention hall for public uses as a public utility. The Constitution of Oklahoma provides that municipalities may incur

indebtedness "for the purpose of purchasing or constructing public utilities, or for repairing the same;" and the court held that a convention hall was a public utility; and in so doing, in our opinion, stretched the doctrine of legal exegesis to the breaking point.

Sections 4 and 5, Article XVIII of the Ohio Constitution, provides that any municipality may acquire, construct, own, lease, and operate a public utility; but these sections taken in connection with the remaining section clearly indicate that the utility meant is limited to lighting, furnishing water, common carrier facilities, and kindred or like utilities.

Section 12, Article XVIII, however, provides that the bonded indebtedness incurred for such utilities "shall be secured only upon the property and revenue of such public utility, including franchise," and "shall not impose any liability upon such municipality." So that it will be seen that this citation is not in point, except in so far as it indicates the extreme limit to which the Supreme Court of Oklahoma extended the doctrine of construction to enable the city of Guthrie to construct a convention hall for public purposes. We think, however, that the Supreme Court of this state has practically and in effect decided the question.

In *State, ex rel,* v. *Turner,* 93 O. S., 379, it appears that the city of Akron owned some real estate worth approximately $65,000, and deeded the same to the state of Ohio for the purpose of building an armory thereon, under and by virtue of Section 5256, General Code, which authorizes the state armory board to receive gifts of land, among other property, for the purpose of aiding in the purchase, building, furnishing and maintaining of an armory building. The city of Akron, however, reserved the right, in its deed, to the use of a certain portion of the building to be erected for rooms suitable for the drill and instruction of the police and firemen of the city of Akron, and an auditorium available to the city of Akron for all civic purposes not interfering with the proper use of the armory by the state militia. The state appropriated $115,000 for the erection of the armory. The state armory board prepared and adopted plans for the

armory building.   The relator, the Climmer & Johnson Company, was awarded the bid or the contract for the construction of the armory, and an action in mandamus was brought to compel the Attorney-General (Turner) to draw the necessary contracts for awarding the bid to the relator, which the respondent had refused to do.   The fourth part of the syllabus reads:

"An averment in a pleading that the plans adopted by the state armory board for an armory building include an auditorium that will be available for civic purposes, does not tender any issue that the state armory board, in adopting such plans, abused its discretion or was guilty of any fraudulent conduct in reference thereto."

On page 388, Donahue, J., says:

"*The city of Akron has a right to build an auditorium for civic purposes.*   It has a right to provide for a room or rooms for the drill and instruction of its police and firemen, and for this purpose it is authorized to levy taxes upon all property within the corporate limits."

The dictum of this case goes further than the application of the functions of government to the protection of the citizen. The right to have a room for the drill and instruction of police may properly be said to have relation to the protective functions of government; but the right to build an auditorium for civic purposes can not be said, strictly speaking, to fall into that classification; and it must be said to proceed from the exercise of the power indirectly, and growing out of the right of the people to assemble for civic purposes, and to consult for their common good, as it is provided by the Constitution they may do.

There still remains the question, has the city of Cleveland the power conferred by statute, by charter, or inherently under the enlarged powers of local self-government conferred by the home rule provisions of the Constitution, to erect a hall or building for exposition purposes?

Section 3939 of the General Code provides that the council of a municipal corporation may, by an affirmative vote of not less than two-thirds of the members, by resolution or ordinance,

issue and sell bonds in the manner therein provided for certain purposes, among which, as provided in the tenth subdivision of the section, is "for erecting public halls and public offices."

It will be noticed that the word "public" is repeated after the conjunction "and" in this subdivision. The word "and," as defined in the Century Dictionary, is a colorless particle without an exact synonym in English, but expressed approximately by "with," "along with," "together with," "also," "moreover," the elements connected being grammatically co-ordinate.

Owing to the repetition of the word "public," we think the Legislature intended and meant to say that the cities of Ohio could, under Section 3939, General Code, incur obligations or indebtedness, in the manner provided in the section, for erecting public halls, and also or moreover for erecting public offices, or that the city could erect public halls together with public offices; and that the construction contended for by plaintiff is too circumscribed and too narrow. The plaintiff calls attention to the fact that the city of Cleveland has already what is popularly called a city hall; and it is claimed that this building has ample space for the accommodation of the officials and business of the city for the next fifty years. The record shows that this is hardly in conformity with the facts, for it appears that this so-called city hall is not sufficient for the city needs and is already over-crowded. As originally planned, it perhaps would be sufficient for the city needs for the next fifty years, but a spasm or waive of false economy resulted in the construction of a much smaller and more circumscribed building. Strictly speaking, the so-called city hall is simply an administration building or collection of offices for city purposes, and nothing more. It includes a council chamber and rooms for the administration of justice, that is, court rooms for the municipal court, which never should have been located in this building, as, owing to the confusion incident to carrying on the work of a popular court of this character, much annoyance and interference will necessarily result to the orderly transaction of the public business.

The word "hall" in this country has not the broad meaning that it has in England, where practically every large building is called a hall, including private residences.

A building for exposition purposes may, by a very liberal defi-nition, be called a hall; but to the ordinary man an exposition building means a place where shows or circuses may be held, or the products of art and manufacture be exhibited, primarily for advertising and sale purposes, but incidentally for the pur-pose of showing the progress in art and manufacture, and to this extent educational, but of a character not included in the func-tions of government.

Schools purely technicological in character and schools for the inculcation of esthetics, the science and theory of beauty in per-ception and expression, belong to the domain of private enter-prise. State education, that is, education designed for the public *en masse* or as a whole, is limited in its scope to the ordinary de-mands and requirements of good citizenship. We can not all be artists and technicological experts, and those who desire to be such should not call upon the public to aid their ambition, how-ever laudible and praiseworthy.

The use of the contemplated building for exposition purposes we think unwarranted, unless the doctrine of state socialism is to be considerably advanced, and so advanced as to foster, pro-mote and encourage improvidence and poverty. This does not mean, however, that the auditorium which the city has power to build, erect and maintain, might not be used for such purposes after its construction. It only means that a municipality may, not use or appropriate public funds for the erection and main-tenance of a building designed primarily for exposition purposes. That a municipality has the right to make any lawful use of a building it has power to erect and the right to own and maintain, can not be denied, during such periods as its use may not be re-quired by the public.

The word "auditorium," as used in the resolution of council, must be given its popular and not its restricted meaning; that is, a room of large capacity capable of accommodating a large as-semblage of people. The extent and character of the hall or room is indicated by the amount of money raised or appropriated for its erection. If the power and the right to provide such a build-ing arises out of the inherent right of the people to assemble to

consult for their common good, or for any lawful purpose, or to petition for a redress of grievances, it must of course be free and open to all people, subject to proper rules and regulations to prevent an abuse of the right. We apprehend the city would have a right to prevent the assembling of persons whose purposes may be inimical to society and subversive of social order. Assuming that the people would only demand the use of the auditorium for proper purposes, it must be conceded that such use will necessarily be infrequent, at least only when necessity therefor arises. If its use is confined to these specific purposes, it will necessarily be unoccupied perhaps two-thirds of the time; and we see no reason, legal or otherwise, why the city may not, during such period, derive revenue from its use by private parties who may desire to occupy it for conventions or exposition purposes or for purposes not strictly competitive. As there is no room of the seating capacity of the contemplated auditorium in this city, and perhaps never will be, it can not be said the city, in renting it when not needed for public use, will be engaging in a private enterprise in competition with similar enterprises, as the possibility of there being a similar enterprise or one of like character is so remote as to be purely speculative. This must be the view taken by the court of appeals when the question was presented to it, as the resolution calls for a public hall for auditorium and exposition purposes. The "exposition purposes" may be only an incidental use to which the auditorium may be put. Granted that the city has the right to erect and construct an auditorium, its right to control and use this auditorium, after it has been erected, for all lawful purposes may not be restricted. It seems from the record that the proposed auditorium will not occupy to exceed sixty-five per cent. of the space afforded by the contemplated structure. To say the city may not utilize this space for purely municipal purposes, such as additional offices or rooms for the accommodation of public business, because such purpose is not clearly expressed in the title of the resolution, is asking a construction to which the court can not accede. Incidental to the use of an auditorium is the necessity for providing suitable lobbies and such ante-rooms as the nature of

the auditorium may require. In a city of a million people public questions frequently arise the decision of which may be of momentous importance to the people. Investigations are frequently had, and more than one investigation may be carried on at the same time. In such event we see no reason why provision should not be made for such investigations and for the accommodation of a large number of the public who may desire to be present on such occasions. Besides, it must be said that, so far as the record shows, it is wholly speculative and problematical at this time just what kind of a design or plan will be eventually adopted for this building. The most that can be said is that the plans and designs now under consideration are merely preliminary or tentative. The question is not really before the court. In the petition filed by the director of law there are claims that the mayor intended to use the building or portions of it for shows, concerts, theatrical performances, and lectures to be given for profit by private persons, and this was to be done for revenue purposes, the city to be responsible for any and all loss due to maintenance. In the petition now before the court this threatened use of the building is more explicitly alleged and at greater length and in greater detail; in fact, the claim is that it is proposed to have the city go into the business of providing, in this building, a number of lecture and concert halls, and perhaps theaters, which are to be rented out to private individuals; in other words, that, so far as the renting of halls is concerned for such purpose, the city is to become a competitor with the owners of similar enterprises or halls.

If this is true, it will be in contravention of the clearly expressed functions of municipal government, and would, we think, fall squarely within the doctrine of *State, ex rel*, v. *Lynch*, 88 O. S., 71, where it is held that a municipality has no authority, under the powers of local self-government, to establish and maintain a moving picture theater. To establish and maintain a moving picture theater is purely a private enterprise, and is no part of the functions of government; and to construct, erect and maintain a number of halls to be rented or leased for theatrical and concert purposes, lodge rooms, and

purposes of a similar character, would be engaging in private competitive business. However, the allegations of the petition in this respect are purely anticipatory, if not speculative. The mayor has no authority to plan, design and erect this building to suit his own conceptions of what such a building should be. Assuming that the administrative function of government includes all municipal action not included in the legislative and judicial departments, it can not be said that the plan, design, location and character of the building is an administrative function. The people most assuredly have a right to say just how the money they voted shall be expended, and this right they express through the council. Section 177 of the charter of the city of Cleveland reads as follows:

"There shall be a city plan commission to be appointed by the mayor, with power to control, in the manner provided by ordinance, the design and location of works of art which are or may become the property of the city; the plan, design and location of public buildings, harbors and bridges, viaducts and street fixtures, and other structures and appurtenances; or relocation or alteration of any such works belonging to the city; or location, extension and platting of streets, parks and other public places, and of new areas; and the preparation of plans for the future physical development and improvement of the city."

Can it be said that the city plan commission may locate new streets, provide for parks, relocate and alter public works, and build harbors, bridges, viaducts and public buildings, of its own volition and without express authority from the city council? Such a contention would be absurd.

It will be noticed that by this section the city plan commission has "power to control, in the manner provided by ordinance, the design and location of public buildings." Objection is made by the plaintiff in this case and in the brief filed by Mr. Van Svarc, one of counsel for relator, in cause No. 148749, that the resolution of council was defective because it does not disclose the site or location of the proposed auditorium; and it was gravely and solemnly asseverated that for aught that appears in the resolution the auditorium may be located outside of the corporate limits of the city of Cleveland. And it was also asserted

that the phrase "public hall for auditorium and exposition purposes" does not sufficiently express the intention of the council.

The framers of the resolution of February 28, 1916, evidently knew that the charter provided for further legislation in which the plan, design and location of the auditorium would be provided for. Section 177 of the charter was carefully drawn, the city reserving the right, through its representatives, to say where its public buildings and public works shall be located, and how they may be designed and constructed. While the city plan commission has power to control the plan and design of a public building, it is not given power to make or design or draw the plan to suit its pleasure, and therefore the plan and design must be drawn in the manner provided by ordinance. No one will contend that the mayor or the city plan commission can locate a bridge, harbor or building irrespective of the demands of the people or the wishes of the city. Neither can the mayor or the city plan commission finally and absolutely determine the character of such constructions or improvements. The mayor and the plan commission may advise, and, through the city architect, prepare and submit plans and designs for public improvements, but such plans and designs must be approved by ordinance before the city plan commission can assume control and authority over them, and then the control and authority must be exercised in accordance with the terms of the ordinance.

Section 177 *et seq.* of the city charter, which are really declaratory of Section 3677, General Code, provide how property for locations of public works may be secured; and it must, of course, be done by declaratory ordinance and condemnation.

So that it seems these objections can not be considered at this time. When the city undertakes to pass an ordinance specifically defining the plan and design of this auditorium, and such plan or design clearly shows a purpose not warranted by law, or beyond the delegated or inherent powers of the city, it may be proper to ask the intervention of a court of equity.

When cause 148749 was before the court of appeals, that court had a right to ignore these allegations of the petition. Even if it was admitted by the demurrer that the mayor proposed to design the contemplated auditorium building for purposes not

warranted by law, the court of appeals had a right to take into consideration the fact that it was impossible for the mayor to affectuate any such purpose; and, besides, the court had a right to assume the mayor would not undertake to do so, as all public officers are presumed to obey all laws prescribing their duties. Besides, it is so apparent that in the very nature of things the mayor could not locate this building or design its plan to suit his own purposes, that the allegations to this effect in the petition might well be treated as mere surplusage and of no declarative value in a pleading. It must be held that this question was not properly before the court of appeals, and that it is not now properly before this court. If the contingency involved in this contention, aside from location, which we understand has been settled, ever does arise, it can be met by suitable action.

There remains only the question of *res judicata*. Counsel for defendant contend that all the matters and questions raised in the plaintiff's petition, now before the court, were settled and adjudicated in cause 148749.

The term *"res judicata"* literally means "the matter has been decided" (*Schumacher* v. *Cincinnati*, 68 O. S., 603), the principle being that a cause of action once finally determined between parties by a competent tribunal can not afterwards be litigated between the parties or their privies in a new proceeding. *State* v. *Judges*, 69 O. S., 372.

It has been held that before it can be said that a matter is *res judicata* four conditions must concur, namely:

1st. Identity of the subject-matter.

2d. Identity of the cause of action.

3d. Identity of persons and parties.

4th. Identity in the quality of the persons for or against whom the claim is made.

This is perhaps the settled law in the United States.

By identity of parties is not meant that they should have stood upon the record as plaintiff and defendant, but that that should have been their real attitude upon the issues tried and determined. *Koelsch* v. *Mixer, Admr.*, 52 O. S., 207.

Under the term "parties" may be included all who are directly interested in the subject-matter, and who had a right to

make defense, control the proceedings, examine and cross-examine, and appeal from the judgment. *Cincinnati* v. *Wright,* 1 Western Law Bulletin, 387.

The action brought by the director of law, cause 148749, was brought by the city of Cleveland on the relation of W. S. Fitz-Gerald as director of law. This action was really brought in behalf of every resident tax-payer in the city; and it must be held that the plaintiff in this case was in fact a party plaintiff in that action, in fact, conducted the proceeding, filed a brief in the case, argued it before the court of appeals, and if he had taken the precaution to have himself entered as attorney of record, we believe he might have moved the Supreme Court for certification of record, though the exigencies of the situation do not demand that we so hold.

In the two petitions there is an identity as to the cause of action; and there is an identity in the quality of the persons whose rights were involved in that action.

*Columbus* v. *Schneider,* 14 C.C. (N.S.), 312, although perhaps not directly in point, is clearly affirmative of this proposition. It was held in that case that "actions brought by the proper party against a municipality to enjoin the collection of a street improvement assessment, where submitted on the issues and decided against the plaintiff by the upholding of the assessment, amounts to a conclusive adjudication of the validity of the assessment in an action brought by the city against other parties to enforce the collection of assessments against their property for said improvements." See also to the same effect *City of ElRano* v. *Paving Co.,* 27 L. R. A. (N. S.), 650.

Counsel for defendant, however, claim that every matter which the parties might have litigated in cause 148749 is *res judicata.* We have already indicated and held that neither the director of law in that cause nor the plaintiff in the case now before the court could properly raise the question as to whether the city of Cleveland has the right to engage in the private business of renting halls, as that question was not before the court of appeals, nor is it before this court.

The plaintiff insists that the issues involved in the petition now before the court are not *res judicata,* for the reason that the ac-

tion instituted by the director of law, known as 148749, was not brought in good faith and was really intended to prevent the plaintiff or other resident tax-payers from bringing such action.

It may be said that a nice sense of ethical propriety, or perhaps a supersensitive sense of the ethical considerations involved, would have suggested to the director of law that the action be begun and prosecuted by the plaintiff, as it was wholly a matter of discretion with the director of law, and we can not say from the record that there was an abuse of this discretion, but must presume that the director, in bring-, ing this action, honestly intended to fully present all the issues which the plaintiff desired to the court.

In view of all that has been said, and for the reason stated in this opinion, the court finds:

1. That the resolution of the city council of March 28, 1916, was duly and regularly passed, and the purpose and object of the resolution was sufficiently stated in the title by the language therein used. The resolution was not such an emergency as is contemplated by the provisions of the Constitution or the provisions of the charter of the city of Cleveland. Ordinances and resolutions, except emergency measures, do not go into effect until forty days after their passage, in order that the people may petition for a referendum thereon. By Section 66 of the charter, ordinances or resolutions passed as emergency measures go into effect at the time indicated in the ordinance or resolution, but they are nevertheless subject to referendum in like manner as other ordinances. As no referendum was applied for on the resolution of February 28, 1916, it must be held that the ordinance is in full force and effect.

2. The city of Cleveland has full legal right and power to build a public hall for auditorium purposes, and to issue bonds for that purpose; and the right to use such auditorium, after the same has been constructed, for any lawful purpose, and derive revenue from such use. But the city has no authority, under the Constitution of Ohio or the statutes of the state or its charter, to issue bonds to be used primarily for a building for exposition purposes; or to so use portions of the auditorium for

lodge rooms, concert halls, show rooms, or theaters as purely private enterprises.

3.   That the judgment of this court, in cause 148749, was affirmed by the Court of Appeals of Cuyahoga County in cause 1289, after a full hearing on the merits; that said action was brought and prosecuted in good faith by the director of law of the city of Cleveland; that both courts had full jurisdiction of the parties and the subject-matter thereof; that. the parties in said cause were the same as the parties to this action, or were identical in interest; and that all the issues which could properly be presented for hearing and determined in said cause, or might or could have been so properly presented, are presented for hearing and determination here, and were then and there fully and finally determined against the plaintiff here so far as they were properly before said court.

4.   The question of the right of the mayor or of the city of Cleveland to construct, build and provide, in the auditorium building, rooms for shows, circuses, theaters, concerts, or lodge rooms, for the purpose primarily of deriving revenue by leasing such rooms to private persons, was not in issue before said court of appeals in cause 1289, and was not passed upon by said court, and is not by its decision *res judicata.*

5.   As the city council of the city of Cleveland has not taken any action as to the plan or design of the auditorium building, or determined by ordinance what the design or plan of said auditorium is to be, and such ordinance is essentially necessary before said auditorium can be finally constructed, the allegations of the petition as to its contemplated use are purely anticipatory, speculative and premature, and not before this court for decision or adjudication.

6.   In designing and planning the auditorium, the city may lawfully provide rooms other than the auditorium for purely civic and municipal purposes; and when such rooms are not needed for such purposes, the city may derive revenue therefrom by lease or otherwise.

A journal entry will be drawn in accordance with the opinion of the court.